David A. SPINDLE, M.D., Appellant,

v.

SISTERS OF PROVIDENCE IN WASH-
INGTON d/b/a Providence Alaska Medi-
cal Center; Alaska Regional Hospital;
Anchorage Neurosurgical Associates,
Inc.; John C. Godersky, M.D.; and Louis
Kralick, M.D., Appellees.

No. S–10169.

Supreme Court of Alaska.

Dec. 20, 2002.

Rehearing Denied Jan. 31, 2003.

Andrew K. Kurzmann, Attorney at Law, Anchorage, for Appellant.

John M. Conway and Robert J. Dickson, Atkinson, Conway & Gagnon, Anchorage, for Appellee Sisters of Mercy Providence Hospital, Inc.

Matthew K. Peterson and Scott Hendricks Leuning, Clapp, Peterson & Stowers, LLC, Anchorage, for Appellees Anchorage Neurosurgical Associates, John Godersky, M.D., and Louis Kralick, M.D.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, and CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

Dr. David K. Spindle appeals from the decision of the superior court granting summary judgment to Drs. Louis Kralick and John C. Godersky as well as their business Anchorage Neurosurgical Associates, Inc. and Sisters of Mercy Providence Hospital, Inc. on Dr. Spindle's claims arising from his failure to obtain privileges at Providence Hospital. Because the superior court correctly found that Dr. Spindle's failure to finish his application for privileges at the hospital rendered his antitrust and tort claims premature and thus not actionable, we affirm the decision of the superior court.

## II. FACTS AND PROCEEDINGS

Dr. David K. Spindle is a neurosurgeon and is licensed to practice medicine in Alaska. Dr. Spindle has been licensed to practice in California, Nevada, and Hawaii as well.

Dr. Spindle practiced medicine at Downey Community Hospital (Downey) in California before coming to Anchorage, Alaska in 1996. Dr. Spindle came to Alaska after seeing an advertisement in a medical journal for a neurosurgeon at Alaska Native Medical Center (ANMC). Dr. Spindle worked at ANMC for approximately fourteen months.

There are a limited number of neurosurgeons in Alaska. Drs. Louis Kralick and John C. Godersky, who practice together at Anchorage Neurosurgical Associates, Inc. (ANA), and Dr. Lawrence Dempsey were the only neurosurgeons in practice when Dr. Spindle arrived. Drs. Kralick and Godersky were the only neurosurgeons with privileges at Sisters of Mercy Providence Hospital, Inc. (Providence). Dr. Godersky serves as chair of the department of surgery at Alaska Regional Hospital, Inc. (ARH) and formerly served as a member on the credentials committee and board of trustees there, as well as chief of staff. At Providence, Dr. Godersky was the subsection chairperson of neurosurgery at the time of Dr. Spindle's application and had served as the treasurer of the medical staff. Dr. Godersky now serves as chairperson of the department of surgery at Providence.

On August 8, 1995 Dr. Spindle applied for medical privileges at ARH, and he applied for privileges at Providence on August 10. In applying to Providence, Dr. Spindle completed an appointment consent and release. In it, he acknowledged "that, as an applicant for appointment to staff membership and privileges, I have the burden of producing adequate information for a proper evaluation of the above criteria and for resolving any doubts about such qualifications." Dr. Spindle also agreed through the release to provide any "additional information as may be requested by the hospital, its Medical Staff or their representatives."

On November 2, 1995 Dr. Steven Floerchinger, chair of surgery at Providence,

found Dr. Spindle qualified for privileges "pending review by Dr. John Godersky, neurosurgery subsection chair." Dr. Godersky then allegedly reviewed the file and said Dr. Spindle could have privileges. Dr. Godersky, however, refused to interview Dr. Spindle or "sign off" on his application.

An applicant for privileges at Providence is required to complete a page naming the exact procedures for which privileges are requested. In his application for medical privileges at Providence, under neurosurgical privileges Dr. Spindle checked off every category of procedures except for two.

The credentials committee at Providence found certain things unusual about Dr. Spindle's application. First, the committee found it unusual that Dr. Spindle's professional liability insurance had been terminated. Second, the committee found it unusual that Dr. Spindle had professional liability claims pending at the time of his application and that his letter of reference was from a doctor outside of his specialty. Finally, the committee found it strange that Dr. Spindle wrote "board qualified in neurosurgery in 1965" on his application. This was odd because the industry term is "board eligible." "Board eligible" means a practitioner has been accepted to take the exam for board certification. One is board eligible for a limited period of time while the exam is pending. Dr. Spindle is not certified by the American Board of Neurological Surgery, having twice failed the oral section of the board exam.

On January 10, 1996[1] Douglas Bruce, Chief Executive of Providence, wrote to Dr. Spindle informing him he had been granted temporary privileges, effective January 10 through February 29, 1996. The letter also stated that Dr. Spindle had a scheduled interview with the committee on January 23, 1996. Following that interview, Bruce wrote Dr. Spindle and informed him that his temporary privileges were terminated because Dr. Spindle "ha[d] not completed the application process" and that the credentials com-

mittee had tabled his application pending completion of the following:

a. The Chair of the subsection of Neurosurgery must review, interview, and provide a recommendation for privileges to the Credentials Committee.

b. Submit your plan for surgical coverage of your patients when you are not available to the Credentials Committee.

c. Submit your plan to have a Class I neurosurgeon[2] assist you on all major cases as noted in the Department of Surgery Rules and Regulations, Eligibility, Class II.

The redacted minutes of the committee's meeting reflect this action. Dr. Godersky did not attend the meeting where Dr. Spindle's privileges were terminated and alleged that he had no input in the termination of those privileges.

In early 1996, after moving to Anchorage, Dr. Spindle telephoned Dr. Kralick. During the conversation Dr. Spindle and Dr. Kralick spoke of the possibility of a cross-coverage arrangement. Dr. Godersky also spoke to Dr. Spindle on the telephone. Dr. Godersky inquired into the scope of Dr. Spindle's practice after being asked by Dr. Spindle to consider a cross-coverage arrangement. Dr. Spindle replied that he was "performing procedures for operations on the cervical spine for degenerative disk disease and disk herniations, and operations on the lumbar spine for degenerative disk disease, and ... carpal tunnel surgery." Dr. Godersky specifically asked Dr. Spindle whether he cared for pediatric patients and Dr. Spindle responded that he did not. Dr. Spindle also responded that he did not provide care for intercranial aneurysms, brain tumors, and trauma patients.

Dr. Spindle attempted to find alternate physicians to provide coverage for him in the event of his unavailability but he was unsuccessful. The doctor covering for Dr. Spindle would have to have privileges at Providence

---

1. The letter is actually dated January 10, 1995, but this appears to be a simple typographical error.

2. A Class I neurosurgeon is a term specific to Providence. To obtain this status, a neurosurgeon is evaluated by his or her peers and recommended to that status.

to be able to provide coverage. According to the letter from Providence, Dr. Spindle needed general coverage for when he fell ill or was on vacation as well as coverage by a Class I neurosurgeon for major procedures. Dr. Spindle contacted Providence on February 5, 1996 to inform it that he was having problems obtaining coverage. Dr. Spindle was then informed by Providence that any qualified physician could provide his general coverage. Providence also provided Dr. Spindle with a list of doctors to contact about coverage. Dr. Spindle alleges that he was told that Drs. Kralick and Godersky would not provide coverage for him. Dr. Spindle also alleges that both "Dr. Godersky and Dr. Kralick refused to even meet with me regarding providing Class 1 neurosurgeon coverage" and that he was told by Drs. Kralick and Godersky "in essence, that I should have asked for their permission before having moved up to Alaska seeking neurosurgical privileges." Dr. Spindle alleges he spoke to a Dr. Scott Mackie who said he would like to provide coverage for him "but declined to do so specifically stating that if he did so, Drs. Godersky and Kralick would no longer see his patients."

As a part of the application process, the committee asked Dr. Godersky as the chairperson of Providence's neurosurgery subsection to appear before it to respond to questions regarding Dr. Spindle's application. During this meeting on February 27, 1996 Dr. Godersky was asked what he thought of the subcategories of practice for which Dr. Spindle sought privileges at Providence. This question most likely arose because the committee had noted that "neither [Dr. Spindle] nor his references had provided information regarding the types of surgeries [Dr. Spindle] performed and their outcomes for the recent past" despite the fact he had "requested full neurosurgical privileges." Dr. Godersky replied that from the previous conversation he had had with Dr. Spindle, he did not believe Dr. Spindle was currently performing all of the procedures for which he had requested privileges.

Dr. Godersky thus made a "recommendation that if [Dr. Spindle] was applying for those particular privileges to take care of those problems, that [the committee] ask him to provide information documenting that he, in fact, had current, recent experience in taking care of the people that he was requesting privileges to care for." Dr. Godersky did not make a recommendation as to whether Dr. Spindle was qualified to obtain privileges at Providence. Dr. Godersky does not recall being asked to interview Dr. Spindle or refusing to interview him as a part of Dr. Spindle's application process. However, Dr. Godersky does recall that the reason he did not interview Dr. Spindle is that regardless of what he recommended, "it could be judged as [him] making a recommendation solely on the basis of economics...." Dr. Godersky claims he had no input regarding whether Dr. Spindle was granted temporary privileges. Also, Dr. Godersky testified that he never even saw all of Dr. Spindle's application and that he reviewed only the page with the list of procedures Dr. Spindle had requested the privilege to perform at Providence.

On March 26, 1996 Providence wrote Dr. Spindle requesting he provide the discharge diagnoses and discharge summaries of all cases he had served on as the primary surgeon over the past two years for review by the department of surgery chair. Providence sometimes requires these documents to help it assess the specific privileges requested by an applicant as well as his or her current clinical competence,[3] which must be assessed in each subcategory of privileges an applicant applies for. It is not unusual to request discharge summaries from applicants and, according to Providence's assistant administrator "half—maybe half" of the applicants who then supply such information are granted requested privileges. Dr. Spindle responded on April 19, 1996, but he did not provide the discharge summaries. He provided only a partial list of patients. The list came from Nancy Stoner, director of medical record services at Downey. In her cover letter to Dr. Spindle, she informed him that

---

**3.** Current clinical competence means "peers have assessed the clinical performance of a physician and think that it is current, up-to-date and clinically appropriate—competent within the standard of practice expected in that field."

if he still wanted the discharge diagnoses and discharge summaries there would be a charge. On May 20, 1996 Providence again wrote Dr. Spindle, asking him to "provide a complete list of all procedures done at all hospitals during this time frame, including the discharge summaries for each patient."

Discharge diagnoses and discharge summaries were required so that the credentials committee could "see the documentation of the outcome of a patient's surgery and the discharge instructions—the status of the patient and what was performed and make clinical judgments about what they're reading." No such information was received from Dr. Spindle. On June 27, 1996, at the request of the committee, Providence inquired as to the status of its request for information and noted that if the documentation was not received by July 20, 1996, Dr. Spindle's application would be retired as incomplete.

On July 3 Dr. Spindle contacted Providence and informed it that he was presently in the process of collecting the information requested in the committee's May 26, 1996 letter. In that conversation Dr. Spindle also allegedly noted that he had spoken to an attorney "with the intent to sue the medical center for not expediting his privileges, but was advised by his attorney to provide the requested information, and then if his application for privileges is not approved he will have better grounds for this lawsuit."

On September 20, 1996 Barbara Kuper, the medical staff coordinator at Providence, not having received the requested information, telephoned Dr. Spindle. Kuper stated that when she spoke to Dr. Spindle, he was surprised Providence had yet to receive the documents. Dr. Spindle told Kuper that he would call Downey and request them again. On September 26 Dr. Spindle dropped off a large packet of documents at Providence with Kuper. However, the documents were not the discharge diagnoses and discharge summaries previously requested; rather, they were operative reports. Stoner, the director of medical record services at Downey, told Kuper that Dr. Spindle had requested only the reports about three weeks prior and that he had specifically asked for operative reports instead of discharge diagnoses and discharge summaries.

On October 16, 1996 Providence again wrote Dr. Spindle to inform him his application was still incomplete. In the letter, Providence extended the deadline, notifying Dr. Spindle that if it did not receive the discharge diagnoses and discharge summaries by October 29, 1996, his application would be retired, requiring re-application for privileges in the event he did produce the requested information.

There is a record of a phone message left by Dr. Spindle on October 29, 1996 to Kuper. In it, Dr. Spindle stated that Downey did "not have the time nor the personnel to supply these discharge summaries." Dr. Spindle further stated that he was "trying to comply, preparatory to a lawsuit if he is not put on staff."

Providence again wrote Dr. Spindle regarding the discharge diagnoses and discharge summaries on November 5, 1996. In the letter, the chair of the committee stated that ten percent of the discharge summaries previously requested would be adequate for its review. The letter also stated that in order for Dr. Spindle's application to be complete, he would still have to submit his plans for coverage.

On May 16, 1997 Providence received a call from Stoner at Downey regarding Dr. Spindle's request for ten percent of his discharge diagnoses and discharge summaries. Stoner stated she was "surprised since she had not heard from Dr. Spindle in such a long time." Kuper informed Stoner that the request for ten percent of the discharge summaries dated from November 1996 and that she would check with the committee to see if it needed any further information from her.

No discharge diagnoses or discharge summaries from Downey were ever received by Providence. Dr. Spindle did provide some discharge diagnoses and discharge summaries from his employment at ANMC.

On March 12, 1998 Dr. Spindle's file was retired as incomplete. No action had been taken on the file since May 16, 1997.

On September 16, 1999 Dr. Spindle filed his complaint in superior court against Providence, ARH, ANA, and Drs. Kralick and Godersky individually, alleging restraint of trade, negligence, and intentional interference with a prospective economic advantage. He also alleged defamation, but that claim was later dismissed in a stipulation by the parties.

On October 25, 2000 all claims against ARH were dismissed with prejudice by the superior court. ARH is not a party to this appeal.

On December 4, ANA and Drs. Kralick and Godersky moved for summary judgment on all claims. Providence joined in the motion. The superior court granted summary judgment. On March 20, 2001 Dr. Spindle objected to the entry of final judgment in the matter, arguing that all claims contained in the complaint had not been disposed of, but final judgment was entered on April 10.

Dr. Spindle now appeals.

## III. STANDARD OF REVIEW

■■■■ We review a trial court's grant of summary judgment *de novo* and affirm its ruling if the record presents no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law.[4] We are not bound by the trial court's articulated reasoning and can affirm a grant of summary judgment on alternative grounds, considering any matter appearing in the record, even if not considered by the trial court.[5] All reasonable factual inferences are drawn in favor of the non-moving party.[6]

■■■ In antitrust litigation, courts attempt to use the summary judgment process spar-

ingly.[7] "When an antitrust plaintiff has established a prima facie case, he [or she] should have an opportunity to prove the necessary supporting facts at trial."[8] However, "the very nature of antitrust litigation encourages summary disposition of such cases when permissible...."[9]

## IV. DISCUSSION

### Dr. Spindle's Failure To Complete the Application Process Was Fatal to His Claims.

Although requested by the committee, Dr. Spindle failed to provide Providence with ten percent of the discharge diagnoses and discharge summaries that it had requested from his previous work. Dr. Spindle also failed to submit a plan for surgical coverage of his patients and a plan to have a Class I neurosurgeon assist him with all major cases. Dr. Spindle claims that his failure to complete the application process was a direct result of the appellees' anticompetitive conduct. Appellees respond that Dr. Spindle's failure to furnish the necessary information renders any claim he might have ineffective because he never finished his application for medical privileges at Providence.

■■■ We proceed cautiously when asked to review the actions of a hospital's governing body. "Courts are in general agreement that the decisions of a hospital governing body regarding applications for hospital privileges are to be accorded great deference, and that judicial review should be limited to factors which are within the expertise of courts."[10] "The evaluation of professional proficiency of doctors is best left to the specialized expertise of their peers, subject only to limited judicial surveillance."[11] "We rec-

---

**4.** *Lincoln v. Interior Reg'l Hous. Auth.*, 30 P.3d 582, 585–86 (Alaska 2001).

**5.** *Wright v. State*, 824 P.2d 718, 720 (Alaska 1992).

**6.** *Lincoln*, 30 P.3d at 586.

**7.** *Odom v. Lee*, 999 P.2d 755, 762 (Alaska 2000) (citing *KOS v. Alyeska Pipeline Serv. Co.*, 676 P.2d 1069, 1073 (Alaska 1983)).

**8.** *Id.*

**9.** *Collins v. Associated Pathologists, Ltd.*, 844 F.2d 473, 475 (7th Cir.1988).

**10.** *Kiester v. Humana Hosp. Alaska, Inc.*, 843 P.2d 1219, 1223 (Alaska 1992).

**11.** *Eidelson v. Archer*, 645 P.2d 171, 177 (Alaska 1982) (quoting *Sosa v. Bd. of Managers*, 437 F.2d 173, 177 (5th Cir.1971)).

ognize that the governing body of a hospital must be given great latitude in establishing standards which an applicant must meet before privileges will be granted." [12] At the same time, we may require a hospital's procedures and standards to be fair and reasonable as well as ensure that they are not applied in an arbitrary or capricious fashion.[13]

▪ Appellees' actions with respect to the discharge records comfortably satisfy the deferential review that we apply in these situations. In requiring the discharge diagnoses and discharge summaries, appellees merely required verification that Dr. Spindle maintained current clinical competence in the procedures for which he sought privileges. We have previously recognized that it may be difficult for a hospital to establish a set of objective criteria to determine whether an applicant is qualified for every medical privilege applied for.[14] Especially in light of the telephone conversation with Dr. Godersky, in which Dr. Spindle admitted that his practice was limited in contrast with the number of privileges he applied for at Providence, the committee's request for the discharge diagnoses and discharge summaries was unquestionably reasonable and within its discretion. Furthermore, Providence decreased the initial requirement—from all Downey discharge diagnoses and discharge summaries to ten percent of those records—to ensure that its request was reasonable. And Dr. Spindle signed the consent and release in his initial application, acknowledging that he had the burden to produce "adequate information for a proper evaluation of the above criteria and for resolving any doubts about such qualifications." Finally, in creating a provision regarding the civil liability of hospitals for certain physicians, the Alaska legislature specifically found that a "hospital

is responsible for exercising reasonable care in granting privileges to practice in the hospital, for reviewing those privileges on a regular basis, and for taking appropriate steps to revoke or restrict privileges in appropriate circumstances." [15]

Under all of these circumstances, Dr. Spindle's failure to provide the credentials committee with the discharge summaries—information that the committee needed to assess his application—is fatal to his claims. The committee, denied the information that was necessary to determine his fitness to practice the broad range of neurosurgical procedures that Dr. Spindle sought privileges to practice at Providence, was justified in retiring his file as incomplete. Thus, without even considering Dr. Spindle's anticompetitive conduct claims, which related to his failure to obtain coverage for his patients when he was not available and his failure to obtain Class I neurosurgeon assistance on his major cases, there was a sufficient basis for the grant of summary judgment.

The requirement to provide the committee with ten percent of his discharge diagnoses and discharge summaries was within Dr. Spindle's control and he failed to meet it.[16] Thus, despite Dr. Spindle's arguments to the contrary, this case is analogous to *Evers v. Edward Hospital Ass'n.*[17] In *Evers*, the court held that an applicant must "provid[e] all information deemed necessary by the hospital ... as a condition precedent to the hospital's obligation to process the application." [18] Dr. Spindle argues in response that this case is inapplicable because it is a breach of contract action as opposed to an antitrust claim. But while Dr. Spindle argues that the appellees prevented him from competing for privileges, they did not prevent him from supplying the discharge rec-

**12.** *Kiester,* 843 P.2d at 1225 (citing *Sosa,* 437 F.2d at 176).

**13.** *Id.* at 1223.

**14.** *Id.* at 1225.

**15.** AS 09.65.096(a).

**16.** Dr. Spindle claimed at one point that he was unable to provide the summaries because of cost.

But the record shows that he never determined the actual cost. Moreover, Dr. Spindle's request for operative reports instead of the discharge diagnoses and discharge summaries that the committee had actually requested served to increase the costs.

**17.** 247 Ill.App.3d 717, 187 Ill.Dec. 490, 617 N.E.2d 1211 (1993).

**18.** *Id.* 187 Ill.Dec. 490, 617 N.E.2d at 1219.

ords that were requested. It was within Dr. Spindle's power to obtain the discharge summaries but he failed to do so. Based on the undisputed evidence before us from Stoner, the only inference that can be drawn from the record is that he simply chose not to do so.

We conclude, as in *Evers*, that the hospital's requirement that a sample of discharge records be supplied was a reasonable condition precedent to any required action by the hospital. The failure of Dr. Spindle to comply with this request renders his claim of anticompetitive conduct and conditions in the application process premature. Until and unless Dr. Spindle complies with the clearly reasonable conditions he may not be heard to complain that other acts and practices are unreasonable and monopolistic.[19]

## V. CONCLUSION

Because there are no genuine issues of material fact in dispute, we AFFIRM the decision of the superior court granting appellees' motion for summary judgment.

BRYNER, Justice, not participating.

19. This conclusion also justifies the entry of summary judgment on the hospital's immunity claims under federal and state law and Dr. Spindle's claim of intentional interference with prospective economic advantage, and makes it unnecessary for us to consider those issues.