MATANUSKA ELECTRIC ASSOCIATION, INC., Appellant/Cross–Appellee,

v.

CHUGACH ELECTRIC ASSOCIATION, INC., Appellee/Cross–Appellant.

Nos. S–10598, S–10618.

Supreme Court of Alaska.

Oct. 8, 2004.

35. *Id.* at 958.

See also 53 P.3d 578, 58 P.3d 491.

Kyle W. Parker and David J. Mayberry, Patton Boggs LLP, Anchorage, for Appellant/Cross–Appellee.

James E. Torgerson, Jonathan B. Ealy, and Aaron M. Schutt, Heller Ehrman White & McAuliffe LLP, Anchorage, and Donald W. Edwards, General Counsel, Chugach Electric Association, Inc., Anchorage, for Appellee/Cross–Apellant.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

Matanuska Electric Association (MEA) sued Chugach Electric Association (Chugach)

for breach of contract. The superior court denied Chugach's motion to dismiss, but granted its motion for summary judgment. MEA appeals and Chugach cross-appeals. We affirm the court's grant of summary judgment to Chugach on MEA's ninth cause of action, but reverse its grant of summary judgment to Chugach on MEA's fifth cause of action. We accordingly reverse and remand on the amount of attorney's fees as well.

## II. FACTS AND PROCEEDINGS

### A. Facts

MEA and Chugach are electric utility corporations.[1] MEA does not produce the electricity it sells to its customers; it buys electricity from Chugach pursuant to a purchase and sale agreement (the Agreement).[2] The Agreement became effective in 1989 and runs through 2014.

Section 17 of the Agreement provides that the parties must act in good faith and in conformance with prudent utility practice. Section 34(*o*) defines prudent utility practice for the purposes of the Agreement. Section 9 governs ratemaking between Chugach and MEA, though Chugach's rates must ultimately be approved by the Regulatory Commission of Alaska (the Commission).[3] Section 9(d) of the Agreement requires Chugach to submit any proposed rate changes to a Joint Committee, composed of two members of the Chugach board of directors and one member, appointed by the AEG & T board of directors, who is a member of both the AEG & T and MEA boards of directors. The Agreement calls for Chugach to submit its proposed rate changes to the Commission after a Joint Committee review process, during which MEA has the right to submit evidence

---

1. Many of the facts in this decision are taken from *Matanuska Elec. Ass'n, Inc. v. Chugach Elec. Ass'n, Inc.*, 53 P.3d 578 (Alaska 2002) and *Matanuska Elec. Ass'n, Inc. v. Chugach Elec. Ass'n, Inc.*, 58 P.3d 491 (Alaska 2002).

2. The Alaska Electric Generation and Transmission Cooperative (AEG & T) is also a party to the Agreement, but was not a party to this case.

3. The name "Regulatory Commission of Alaska" was substituted for "Alaska Public Utilities Commission" in 1999 in accordance with ch. 25, § 30(a), SLA 1999.

and address the Joint Committee. Section 9(h) of the Agreement provides Chugach with the right to bypass the Joint Committee process to develop interim rates.

In order to raise capital, Chugach issued two sets of bonds in 1991. As of December 31, 1998 Chugach had $23,205,000 in outstanding bonds due in 2002 and $217,705,000 in outstanding bonds due in 2022. These bonds had a blended interest rate of 9.04%, which Chugach noted was "higher than the interest rates that would accrue on debt of the same maturity originated in today's market." Rather than defease[4] or otherwise refinance this debt, Chugach hedged against future rises in interest rates by entering into a treasury rate lock agreement.[5] According to MEA, Chugach's failure to refinance required MEA to pay higher prices on the electricity it bought from Chugach.

In October 1999 the Commission ordered Chugach to file a general rate case by June 30, 2000 based on the test year 1999 so that it could better evaluate the reasonableness of Chugach's rates. Before this deadline, MEA twice wrote to Chugach to remind it that the Agreement required it to submit its rate case to the Joint Committee before filing it with the Commission. In March 2000 Chugach responded to these letters with an outline indicating that it would begin the Joint Committee process on May 15, 2000. MEA rejected this proposal and filed a motion for a preliminary injunction ordering Chugach to submit the rate case to the Joint Committee eleven weeks before the Commission deadline. The parties settled this dispute in March 2000, and Chugach agreed to begin the Joint Committee process no later than eleven weeks before the Commission deadline.

In June 2000 the Commission changed the test year to 2000 and extended Chugach's filing deadline to June 30, 2001. In February 2001 MEA again reminded Chugach of the Joint Committee requirement, but Chugach responded by stating that it would not be able to submit the rate case to the Joint Committee eleven weeks before the Commission deadline. Instead, Chugach proposed that it submit the rate case to the Joint Committee at the same time as it submitted the rate case to the Commission, and noted that it might seek to establish interim rates outside of the Joint Committee process. MEA rejected this proposal, stating that Section 9(d) of the Agreement was intended to provide MEA with an opportunity to participate in developing the rate case before its submission to the Commission. In May 2001 the Commission again extended the deadline, to early November 2001. Finally, in July 2001 Chugach filed its 2000 rate case with the Commission, requesting both interim and permanent rates, without submitting the rate case to the Joint Committee process.

---

4. "Defeasance" is sometimes used by public utilities to refinance or remove bonded indebtedness. The utility purchases U.S. Treasury or other government-backed securities. The interest and principal payments from these securities are then used to cover the debt-service requirements of the outstanding bonds. The bond debts are thus removed from the utility's balance sheet for accounting and financial reporting purposes. Depending on the method of defeasance used, the utility may also be freed from any indenture provisions related to the bonds. *See* James Hempstead, *Total Recall*, 132 No. 4 Fort. 20, 22 (1994).

Chugach argues that defeasance does not really eliminate bond debt, but only shifts it. Chugach also asserts that it would have had to borrow funds in larger amounts than its outstanding bond principal in order to purchase sufficient government securities to cover its bond debts, because government securities are low risk and thus pay low interest rates. In sum, Chugach claims that defeasance "did not make financial sense" and was "the most expensive, least attractive" refinancing method available.

5. A "rate-lock" is a derivative or hedge agreement based on interest rates. *See* Mathew Urbina and David J. Mangefrida, *Regulatory Monitor: Recent IRS (Mis)guidance?*, Investment Lawyer, April 2002, at 18. In this case, the rate-lock was based on U.S. Treasury interest rates. Chugach wanted to offset the risk of potentially higher interest rates on its bonds. Under the rate-lock agreement, if interest rates rose above a certain target rate as of March 17, 2002 Chugach's hedge partner (Lehman Brothers) would have to make a corresponding payment to Chugach, which would increase proportionally by the amount the actual rate exceeded the target rate. Conversely, if rates fell below the target rate on that date, Chugach would have to make a corresponding payment to Lehman. As with any hedge, the point was to insure against losses resulting from a rise in the price of the underlying commodity (the interest rates). The cost to Chugach of such insurance was the payment amount if rates declined on March 17, 2002.

**558**

### B. Proceedings

In December 1998 MEA filed a complaint against Chugach with the Commission. MEA's complaint requested that the Commission investigate "whether Chugach ... engaged in unreasonable management practices by refusing to refinance its long-term bonded indebtedness." The Commission dismissed MEA's regulatory complaint in June 2000 by declining to initiate a formal investigation into the reasonableness of Chugach's debt management practices.

While its complaint against Chugach was before the Commission, MEA alleged similar claims in a complaint it filed in the superior court in February 2000. In part, this complaint alleged (in MEA's fifth cause of action) that Chugach's failure to refinance its bond debt violated the good faith and prudent utility practice provisions of section 17 of the Agreement, and sought damages for the alleged breach. The superior court denied Chugach's motion to dismiss this claim, but it granted Chugach's motion for summary judgment, holding that Chugach owed MEA no duty under the Agreement to conduct its debt management in accordance with prudent utility practice. MEA also sought (in its ninth cause of action) a declaratory judgment and an injunction ordering Chugach to comply with Section 9(d) of the Agreement by submitting its permanent rate case to the Joint Committee before submitting it to the Commission. The superior court granted summary judgment in favor of Chugach on this issue. Having separately disposed of MEA's other causes of action, none which are at issue here, the superior court entered final judgment in favor of Chugach. Chugach then moved for attorney's fees, which the superior court awarded in the amount of $84,557.67.

MEA appeals the superior court's grant of summary judgment in favor of Chugach on both claims and the award of attorney's fees. Chugach cross-appeals the denial of its motion to dismiss MEA's claim that Chugach's debt management practices were unreasonable (the fifth cause of action).

### III. STANDARD OF REVIEW

We review questions concerning the application of the doctrines of primary agency jurisdiction and exhaustion of administrative remedies *de novo*, as they present questions of law.[6] Whether *res judicata* or collateral estoppel apply are also questions of law, and are therefore reviewed *de novo* as well.[7]

We also review a trial court's grant of summary judgment *de novo*, drawing all reasonable factual inferences in favor of the non-movant, and affirming where the record presents no genuine dispute of material fact and the movant is entitled to judgment as a matter of law.[8] We may affirm a grant of summary judgment on any basis appearing in the record.[9]

If a trial court's interpretation of a written contract was based exclusively on documentary evidence, we review its interpretation *de novo* as a question of law.[10] In conducting such a review we "adopt the rule of law that is most persuasive in light of precedent, reason, and policy."[11]

### IV. DISCUSSION

#### A. Whether Chugach's Debt Management Practices Comply with Prudent Utility Practice Cannot Be Resolved on Summary Judgment.

##### 1. The superior court properly refused to dismiss MEA's debt management claim (fifth cause of action) based on the doctrines of primary agency jurisdiction, comity, failure to exhaust administrative remedies, *res judicata*, or collateral estoppel.

Even though Chugach prevailed on summary judgment, it argues that the superior

**6.** State, Dep't of Revenue v. Andrade, 23 P.3d 58, 65 (Alaska 2001).

**7.** Alaska Contracting & Consulting, Inc. v. Alaska Dep't of Labor, 8 P.3d 340, 344 (Alaska 2000).

**8.** Spindle v. Sisters of Providence in Washington, 61 P.3d 431, 436 (Alaska 2002).

**9.** Id.

**10.** Krossa v. All Alaskan Seafoods, Inc., 37 P.3d 411, 415 (Alaska 2001).

**11.** Guin v. Ha, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

court erred by denying its motion to dismiss MEA's claim related to its debt management practices. Chugach argues that dismissal was appropriate on the grounds of primary agency jurisdiction, "comity and abstention," failure to exhaust administrative remedies, *res judicata,* and collateral estoppel.[12] Chugach's arguments on these issues are based on its mistaken belief that the Commission dismissed MEA's regulatory complaint because it reached the substantive merits of Chugach's debt management practices, and found them reasonable.[13] But the Commission did not reach any such conclusion; it simply exercised its discretion to dismiss MEA's complaint without reaching its merits. The Commission stated that it was "convinced that although there is ample room for argument on the merits of competing financial management strategies, it is not in the public interest at this time to devote the resources required on the part of the Commission or the competing utilities to initiate an investigation." Because the Commission declined to exercise its jurisdiction to hear this complaint, the superior court properly declined to dismiss the suit on these grounds.

### a. The Commission waived its primary agency jurisdiction.

■ Chugach argues that the superior court should have dismissed or stayed MEA's claim that Chugach's debt management practices violated the Agreement's prudent utility practices requirement because the Commission has primary jurisdiction over the claim. We disagree.

■ In *Greater Anchorage Area Borough v. City of Anchorage,*[14] we stated that the doctrine of primary agency jurisdiction provides that "a court *may, in appropriate cases,* stay or dismiss pending litigation so as to enable a proper agency to initially pass upon an aspect of the case calling for administrative expertise."[15] This generally occurs "[w]hen a case raises questions of fact not within the ordinary experience of courts, or if the case requires the exercise of administrative discretion."[16] This doctrine is based on "the need for an orderly and reasonable coordination of the work of agencies and courts,"[17] which is generally best achieved when courts decline to rule "on a subject peculiarly within the agency's specialized field without first taking into account what the agency has to offer."[18] The reasonableness of Chugach's financial management practices is clearly an issue within the Commission's area of expertise.[19]

■ However, as the language of *Greater Anchorage* suggests, and as numerous courts have stated, the primary agency jurisdiction doctrine is one of prudence, and not an absolute jurisdictional limitation.[20] And when an agency has discretion to deny proceedings requested by the plaintiff and elects not to

---

12. Chugach also argues that any award of damages to MEA would constitute prohibited retroactive ratemaking. Because we remand the question of Chugach's debt management practices to the superior court, we decline to reach this issue.

13. As noted in Part II.B., *supra,* before suing Chugach in state court over whether Chugach's debt management practices violated the Agreement's prudent utility practices requirement, MEA brought a similar regulatory complaint before the Commission.

14. 504 P.2d 1027 (Alaska 1972) (*overruled on other grounds by City & Borough of Juneau v. Thibodeau,* 595 P.2d 626 (Alaska 1979)).

15. *Id.* at 1032 (emphasis added).

16. *Oil Heat Inst., Inc. v. Alaska Pub. Serv. Corp.,* 515 P.2d 1229, 1233 (Alaska 1973).

17. *G & A Contractors, Inc. v. Alaska Greenhouses, Inc.,* 517 P.2d 1379, 1383 (Alaska 1974).

18. *Id.*

19. *See* AS 42.05.141(a) and AS 42.05.511(a) (Commission may do all things necessary and proper to carry out its authority, including investigating reasonableness of rates, regulations, and practices of public utilities, including investment policies and practices).

20. *See, e.g., United Parcel Serv., Inc. v. Chadwick's of Boston, Ltd.,* 900 F.Supp. 557, 563 (D.Mass.1995) ("[T]he doctrine of primary jurisdiction does not involve a question about jurisdiction in an ordinary, bright-line categorical sense.... Rather, [it] is a flexible tool for the allocation of business between court and agency [and] is determined by prudential, rather than bright-line categorical, legal grounds.") (internal citations and quotations omitted).

exercise this discretion, the court may decline to apply the doctrine.[21]

The terms of the Agreement itself provide further support for the non-exclusivity of the Commission's jurisdiction. Part 9(f) states: "The unavailability of relief from the Commission shall not act to deprive the reviewing court of authority to order any form of equitable remedy the court considers appropriate."

In this case, the questions of whether Chugach failed to abide by prudent utility practices in its debt management practices, and the amount of damages caused by this failure, were initially presented to the Commission. The Commission declined to resolve these questions. Accordingly, although the doctrine of primary agency jurisdiction would normally apply to a case such as this one, we find that the Commission has waived its primary jurisdiction.

### b. The principle of comity is inapplicable.

■■■■ The Commission's refusal to exercise its jurisdiction over MEA's claim also renders moot Chugach's argument that the superior court erred by not deferring to the Commission under the principle of comity.[22] The doctrine of comity is one of "deference and respect" among tribunals of overlapping jurisdiction.[23] "A question of comity arises when there is 'tension ... between courts and/or agencies having concurrent jurisdiction over the same matter.' "[24] In such cases, "[t]he doctrine of comity teaches that one court should defer action on causes properly within its jurisdiction until the courts of another sovereignty with concurrent powers, and already cognizant of litigation, have had an opportunity to pass upon the matter."[25]

While it might have been proper for the superior court to refrain from adjudicating this claim between the filing (on February 8, 2000) and dismissal (on June 6, 2000) of MEA's similarly worded regulatory complaint, the principle of comity was not implicated, because the Commission subsequently declined to exercise its jurisdiction. The Commission had ample opportunity to pass upon the matter, and declined to do so. Following its dismissal of MEA's complaint, the Commission no longer had concurrent jurisdiction with the superior court, and the principle of comity was no longer relevant.

### c. MEA is excused from exhausting its administrative remedies.

■■■■ Chugach also argues that the superior court should have dismissed this claim because MEA failed to exhaust its administrative remedies. A party must generally exhaust administrative remedies before bringing an action challenging an agency decision; this allows the agency to apply its expertise and correct its own errors.[26] But this requirement may be excused where the attempt to exhaust administrative remedies is futile or severely impractical.[27] We have held the pursuit of administrative relief to be futile where an administrative body refuses to address a legal claim brought by a petitioner.[28] In this case, MEA brought its claim before the Commission, which dis-

21. Mezines, Basil J. et al., 5 Administrative Law § 47.03[1] (Matthew Bender, 1992). *See also Owner–Operator Indep. Drivers Ass'n, Inc. v. New Prime, Inc.*, 192 F.3d 778, 785–86 (8th Cir.1999) (where agency with primary jurisdiction "declines to provide guidance or to commence a proceeding that might obviate the need for judicial action, the court can then proceed according to its own light.") (internal quotations omitted).

22. Chugach mentions "[t]he Doctrines of Comity and Abstention," but in fact has only briefed the comity issue. We therefore decline to consider whether any form of judicial abstention ought to apply to this case.

23. *Yaracs v. Summit Acad.*, 845 A.2d 203, 208 (Pa.Commw.Ct.2004).

24. *Id.* (quoting *Pa. State Troopers' Ass'n v. Pa. Labor Relations Bd.*, 671 A.2d 1183, 1187 (Pa. Commw.Ct.1996)).

25. *Id.* (quoting *Lambert v. Blackwell*, 134 F.3d 506, 514 n. 18 (3d Cir.1997)).

26. *Hyning v. Univ. of Alaska*, 621 P.2d 1354, 1355 (Alaska 1981).

27. *Sprucewood Inv. Corp. v. Alaska Hous. Fin. Corp.*, 33 P.3d 1156, 1164 (Alaska 2001).

28. *State, Dep't of Revenue v. Andrade*, 23 P.3d 58, 67 (Alaska 2001).

missed the claim without adjudication. The exhaustion requirement is thus excused in this case.

### d. *Res judicata* and collateral estoppel are inapplicable.

▆▆▆ Finally, Chugach alleges that the doctrines of *res judicata* and collateral estoppel preclude the "relitigation" of MEA's claim. Only where another tribunal has resolved a claim or issue on its substantive merits will the claim be precluded by *res judicata*[29] or the issue by collateral estoppel.[30] Because the Commission declined to exercise its discretionary power to investigate Chugach's debt management practices, and did not adjudicate the merits of MEA's regulatory complaint, these doctrines cannot bar the superior court from hearing this claim.

### 2. The superior court erred in granting summary judgment to Chugach on MEA's fifth cause of action.

▆▆ After refusing to dismiss MEA's debt management claim outright, the superior court granted Chugach's motion for summary judgment on this issue. The court found that as a matter of law Chugach owed MEA no contractual duty under the Agreement to manage its debt in accordance with prudent utility practice.[31] Because we find as a matter of law that the Agreement did impose such a duty, we reverse.

Our resolution of this issue centers on the meaning and scope of several provisions of the Agreement. Section 17 states that "[e]ach party to this Agreement covenants and agrees to ... act and perform in a

manner consistent with Prudent Utility Practice." Section 34(*o*) later defines Prudent Utility Practice in the following way:

At a particular time any of the practices, methods and acts engaged in or approved by a significant portion of the electric utility industry at such time, or which in the exercise of reasonable judgment in light of facts known at such time, could have been expected to accomplish the desired results at the lowest reasonable cost consistent with good business practices, reliability, safety and reasonable expedition. Prudent Utility Practice is not required to be the optimum practice, method or act to the exclusion of all others, but rather to be a spectrum of possible practices, methods or acts which could have been expected to accomplish the desired result at the lowest reasonable cost consistent with reliability, safety and expedition.

Section 34(*o*) further notes that "Prudent Utility Practice ... shall apply not only to functional parts of the parties' generation, transmission, and distribution facilities, but also to appropriate structures, landscaping, painting, signs, lighting and other facilities."

In granting summary judgment to Chugach, the superior court focused on the latter portion of Section 34(*o*), and what it characterized as the "extreme difference between the class of items mentioned and long-term debt management." The superior court also noted that, although the Agreement is over fifty pages in length, and effective for over twenty years, it does not mention long-term debt management. Accordingly, the court held that both "the language of the contract and a common sense analysis of the expectations of the parties" indicate that, under the Agreement, the prudent utility practice stan-

---

**29.** *Plumber v. Univ. of Alaska Anchorage*, 936 P.2d 163, 166 (Alaska 1997) (providing that "[t]he doctrine of *res judicata* as adopted in Alaska provides that a final judgment in a prior action bars a subsequent action if the prior judgment was (1) a final judgment on the merits, (2) from a court of competent jurisdiction, (3) in a dispute between the same parties (or their privies) about the same cause of action.").

**30.** *Universal Motors, Inc. v. Neary*, 984 P.2d 515, 518 n. 11 (Alaska 1999) (providing that collateral estoppel may be invoked where "(1) the party against whom the preclusion is employed was a

party to or in privity with a party to the first action; (2) the issue precluded from relitigation is identical to the issue decided in the first action; (3) the issue was resolved in the first action by a final judgment on the merits; and (4) the determination of the issue was essential to the final judgment.").

**31.** MEA also argues that Chugach's practices violated the Agreement's express and implied "good faith" requirements. Because we resolve this issue based on prudent utility practice grounds, we do not reach this contention.

dard only applies to the maintenance and operation of Chugach's facilities and equipment. We believe that this standard also governs the utility's investment practices.

 The goal of contract interpretation is to give effect to the parties' reasonable expectations,[32] which we assess by examining the language of the disputed provisions, the language of other provisions, relevant extrinsic evidence, and case law interpreting similar provisions.[33] In reaching a reasonable interpretation of a contract, we attempt to give effect to all of its terms, if possible.[34] We consider disputed language within the context of the whole contract and its purposes, and the circumstances surrounding its formation.[35] While it was understandable to focus only on section 34(o), by doing so the superior court did not consider several of the Agreement's other provisions, and their implications in light of the Agreement's overall purpose.

The overarching language of section 17, stating generally that both parties agree to "act and perform in a manner consistent with Prudent Utility Practice," must apply to the core aims of the Agreement, which include ensuring a fair and reasonable rate scheme. Chugach suggests that because the Agreement does not include any specific price terms, its only purpose is to assure that MEA receives adequate supplies of power.[36] But even though the Agreement does not include specific prices or rates for this power, it does set forth various "substantive ratemaking principles" and "ratemaking procedures" in section 9. The prudence standard therefore must also apply to Chugach's rate-

making scheme, as this is a key component of its supply of power.

A utility's pricing or rate scheme must inherently take all of the utility's costs into account. And these costs include the costs to the utility of managing its debt.[37] It thus stands to reason that if the Agreement applies the prudent utility standard to Chugach's power supply policies in general, and if these policies include ratemaking principles and procedures, then the Agreement also applies the prudent utility standard to Chugach's debt management practices.

This conclusion finds support in the cases that MEA cites to support its contention that "the Prudent Utility Practice Standard has a long-established and accepted usage in the utility industry ... [that] plainly includes application of the standard to a utility's financial management decisions." Chugach responds that these cases only show "that the Commission, as well as similar bodies in other states, has jurisdiction to review and act to ensure that utilities exercise reasonable financial management practices." Along similar lines, the superior court dismissed these cases as "simply stat[ing] that a regulatory commission can force a public utility to manage its long-term debt in accordance with Prudent Utility Practices." But we read these cases more broadly than Chugach and the lower court.

In each case, the relevant utility commission sought to ensure that the utility would provide service to its customers at the fairest rate, and to further this aim, reviewed the utility's financial practices.[38] Thus the Fed-

**32.** *Stepanov v. Homer Elec. Ass'n, Inc.*, 814 P.2d 731, 734 (Alaska 1991).

**33.** *Mitford v. de Lasala,* 666 P.2d 1000, 1005 (Alaska 1983).

**34.** *Id.*

**35.** *Casey v. Semco Energy, Inc.*, 92 P.3d 379, 383 (Alaska 2004).

**36.** MEA disputes the notion that the Agreement's purpose pertains only to the supply of electric power, suggesting instead that it governs "the relationship generally between the parties." This contention is dubious, and because we con-

clude that Chugach's debt management practices are implicated by the Agreement's provisions regarding the sale of power, we need not consider it.

**37.** *See King County Water Dist. No. 75 v. City of Seattle,* 89 Wash.2d 890, 577 P.2d 567, 570 (1978) (utility's rates based in part on "the cost of capital," which includes interest payments on debt and equity capital).

**38.** *See* the Alaska Public Utilities Commission's decision in *In re Homer Elec. Ass'n, Inc.*, No. U-83–35, 6 A.P.U.C. 59 (Alaska Pub. Util. Comm'n Nov. 4, 1983) (abstract only) (full opinion available by request from Regulatory Comm'n of Alas-

eral Power Commission stated: "It is common knowledge that when a utility is not in a good financial condition, service is inclined to suffer and proper rate adjustments are resisted. Accordingly, directly or indirectly, the consumer will be affected." [39] The Commission further stated that "[a] competitive enterprise must seek in every legitimate way to cut its costs and to operate economically." [40] The Commission subsequently stated that at least since 1956, "it has been clear that utility managements are under a duty to refinance their debt in order to take advantage of changing interest rates and provide the consumer with the lowest embedded debt costs." [41]

There can be no doubt that MEA is a "customer" or "consumer" of Chugach's power; even Chugach admits as much. And there is no reason that the rates that Chugach charges MEA for this power should not be based on the same considerations of fairness and reasonableness that govern utility rates for retail customers. Section 9(e)(4) of the Agreement states both that, "in order to give effect to the fairness principles set forth in Section 9(b), any Power Supply Costs that the Commission (or the court) allows Chugach to include in rates for Chugach's retail ratepayers should also be included in rates charged to [MEA] under this Agreement," and that, "to the extent that reasonableness, prudency, and similar standards may by law be invoked and applied to deny recovery of particular costs in rates, the applicability of such standards shall not be affected by this Agreement." The precedents cited by MEA have even greater persuasion power when considered in conjunction with the entire Agreement's purpose and terms. Chugach should have reasonably expected that the

prudent utility standard would apply to its debt management.

Because we conclude that the Agreement impliedly required Chugach to manage its long-term debt in accordance with prudent utility practice, and because it is unclear whether Chugach in fact did so, we reverse the grant of summary judgment and remand this issue to the superior court for further findings.

### B. The Superior Court Properly Granted Summary Judgment to Chugach on MEA's Ninth Cause of Action.

#### 1. Chugach submitted its permanent rate request to the Commission at the same time as its interim rate request; under Section 9(h) of the Agreement both rate requests were exempt from the Joint Committee process.

MEA's ninth cause of action sought to compel Chugach to complete the process for seeking a rate change specified in section 9(d) of the Agreement before submitting its rate case to the Commission. MEA contends that the superior court erred in granting summary judgment to Chugach on this claim. Section 9(d)(1) of the Agreement mandates that

> [b]efore Chugach implements any change in rates, charges, or other tariff provisions applicable to power sold under this Agreement (other than interim tariff changes under Section 9(h) below), the Chugach staff will submit the proposed change, together with such explanatory materials as the Chugach staff has prepared ... to a Joint Committee for review.

ka); *In re Pac. Bell,* 23 C.P.U.C. 316 (Cal. Pub. Util. Comm'n Dec. 22, 1986), in which the California Public Utilities Commission determined that a utility should refinance high-cost debt rather than pass along unnecessarily high interest costs to customers in the form of higher prices. *See also In re Okla. Gas & Elec. Co.,* 5 F.P.C. 52, in which the Federal Power Commission denied in part a utility's request for an exemption from preferred stock redemption regulations, 5 F.P.C. at 59, after determining that the utility's plan to redeem certain stocks and issue new stock would "mortgage the future for a present temporary benefit" to the parent compa-

ny and certain stockholders, and that its likely effect on consumers was "not wholesome." *Id.* at 57–58; *In re Mfrs. Light & Heat Co.,* 44 F.P.C. 314 (1970), in which, examining proposed rate increases by six utilities, the Federal Power Commission specifically addressed a decision by the utility's parent company to repurchase its outstanding debt at a discount. *Id.* at 319–25.

**39.** *In re Okla. Gas & Elec. Co.,* 5 F.P.C. at 58.

**40.** *Id.*

**41.** *Pa. Gas & Water Co.,* 44 F.P.C. at 323–24.

MEA contends that Chugach violated section 9(d) by attaching its 2000 permanent rate case to its interim rate [42] case and submitting both to the Commission four months before the Commission's deadline for filing the permanent rate case, without first submitting it to the Joint Committee. The superior court rejected this argument and granted summary judgment to Chugach because it found that by attaching the permanent rate case to the interim case, both were exempted from the Joint Committee process by the terms of section 9(h), which excludes interim rate cases from review.[43]

Chugach contends that interim rate relief was necessary because it "faced a situation where, if certain conditions came to pass, it could have failed to collect enough under existing rates to cover its financial obligations." Chugach argues that the Commission requires a utility to file its entire rate case with its interim rate request, because it requires the same supporting information for an interim rate request as for a permanent rate request. Chugach argues that this requirement was in harmony with the Agreement because Section 9(h) specifically states that interim rate requests are "subject to such regulatory restraints as may exist at the time" and because it had a reasonable expectation that the contract would be interpreted to allow it to follow the industry practice of making both filings together. MEA responds that allowing Joint Committee review after submission to the Commission would completely frustrate the purpose of section 9(d) because MEA bargained for the provision to ensure that it would have a right to participate before firm positions were taken.

We are troubled by Chugach's avoidance of the Joint Committee process. Section 9(d) of

the Agreement clearly envisions the submission of permanent rate requests to the Joint Committee process prior to their submission to the Commission. Nonetheless, because the permanent rate request was filed simultaneously with the interim rate request, the permanent rate request was entitled to exemption from the Joint Committee process. Chugach was authorized by law to file both requests at the same time. Indeed, the rate filing system appears to call for the submission of both rate requests simultaneously; the interim rate request is simply an extension of the permanent rate request, as both requests require identical information.[44] In describing rate ("tariff") filings, the Alaska Administrative Code provides that "[i]f interim approval of a tariff filing is sought, that request must also be set out in the tariff advice letter." [45]

That Chugach was entitled to file its permanent and interim rate requests simultaneously was reinforced at the July 10, 2001 prehearing conference for Chugach's interim rate request, where Hearing Examiner Clark repeatedly rejected the notion that separate interim and permanent rate filings were required. At one point he stated that "Chugach has the burden of proof on the legal standards so I think we are looking at one filing, not two and not really establishing two separate schedules to accomplish the tasks." Because Chugach's permanent rate request was an extension of its interim rate request, Chugach was entitled to file its permanent and interim rate requests simultaneously under section 9(h), which allows Chugach to bypass the Joint Committee process and "use other or abbreviated procedures to develop interim rates."

**42.** Interim rate relief is granted only when a utility's "financial situation clearly is so critical—and so precarious—that rate relief cannot await the normal regulatory process...." *In re RCA Alaska Communications, Inc.*, 2 A.P.U.C. 173, 185 (Alaska Pub.Util.Comm'n.Nov.22, 1977).

**43.** Section 9(h) of the Agreement provides:
Nothing in this Agreement shall preclude Chugach's use of other or abbreviated procedures to develop interim rates for immediate effectiveness (subject to such regulatory constraints as may exist at the time). All such interim rates shall be subject to refunds if the rates

finally adopted and approved for the period during which the interim rates were in effect are lower than the interim rates.

**44.** 3 Alaska Administrative Code (AAC) 48.275(a) (2000) provides that "each filing with the commission of a permanent or interim tariff revision that involves a change in rates to the customers of a utility or shippers of a pipeline carrier must include" identical information.

**45.** 3 AAC 48.220(a) (2000).

**2. MEA did not properly raise the issue of whether Chugach acted in good faith in submitting its interim rate request to the Commission.**

 MEA argues that summary judgment was inappropriate on the section 9(d) issue because there is a genuine issue of material fact as to whether Chugach acted in good faith in submitting its permanent and interim rate requests. MEA argues that there is ample evidence for a trier of fact to conclude that Chugach filed the interim rate request in order to avoid its obligations under the agreement. Chugach's response is that MEA failed to properly raise this claim before the superior court. MEA does not respond to this argument in its reply brief.

 MEA's Second Amended Complaint did not mention Chugach's alleged bad faith in submitting its rate requests. Additionally, Chugach correctly points out that MEA's briefs before the superior court asserted that "MEA's Ninth Cause of Action presents a pure issue of law concerning the proper construction of Section 9(d)." While MEA may be correct that it set forth evidence that might support a determination that Chugach acted in bad faith, this is irrelevant if MEA did not properly raise that claim. As we have previously held, "[m]atters not made issues or tried before the lower court will not be considered on appeal." [46] Because MEA fails to demonstrate that it properly raised this issue below, we hold that the superior court did not err in granting summary judgment in favor of Chugach on MEA's ninth cause of action.

**C. We Must Vacate the Superior Court's Award of Attorney's Fees to Chugach.**

MEA argues that the superior court erred in granting Chugach attorney's fees because Chugach failed to timely request fees and failed to timely provide documentary support for them. We do not reach this argument, however, because our reversal of summary judgment on MEA's debt management claim requires that we vacate the fee award.[47] On remand, after determining whether Chugach's debt management violated prudent utility practice, the superior court must determine anew whether and to what extent either party is entitled to recover attorney's fees.

## V. CONCLUSION

We AFFIRM the superior court's grant of summary judgment to Chugach on MEA's ninth cause of action, because the Agreement did not obligate Chugach to submit its permanent rate request to the Joint Committee process, and because MEA did not properly raise its claim that Chugach combined its two rate requests in bad faith. But because the Agreement's prudent utility practice provisions apply to Chugach's debt management practices, we REVERSE the superior court's grant of summary judgment to Chugach on MEA's fifth cause of action and REMAND for further proceedings consistent with this opinion. We accordingly VACATE the award of attorney's fees to Chugach and REMAND this issue for further proceedings consistent with this opinion.

---

**46.** *B.B. v. D.D.,* 18 P.3d 1210, 1214 (Alaska 2001).

**47.** *See, e.g., Tenala, Ltd. v. Fowler,* 993 P.2d 447, 449 & n. 7 (Alaska 1999) (reconsideration of attorney's fees warranted after partial reversal and remand).