**MATANUSKA ELECTRIC ASSOCIATION, Appellant/Cross–Appellee,**

v.

**CHUGACH ELECTRIC ASSOCIATION, INC., Appellee/Cross–Appellant.**

Nos. S–12146, S–12165.

Supreme Court of Alaska.

Feb. 16, 2007.

---

Kyle W. Parker, Rebecca S. Copeland, and David J. Mayberry, Patton Boggs LLP, Anchorage, for Appellant and Cross–Appellee.

James E. Torgerson, Heller Ehrman LLP, and Carol Johnson, Chugach Electric Association, Inc., Anchorage, for Appellee and Cross–Appellant.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

FABE, Justice.

## I. INTRODUCTION

Matanuska Electric Association, Inc. (MEA) filed a complaint with the superior court alleging that Chugach Electric Association, Inc. breached its duties under the parties' agreement to act in good faith and conform to prudent utility practice when it entered into a rate lock with respect to certain long-term debt. In connection with an assessment of whether Chugach could amortize its expenses relating to the rate lock, the Regulatory Commission of Alaska made a determination that Chugach's actions with respect to the rate lock were reasonable. Following the Commission's decision, Chugach moved for summary judgment on MEA's breach of contract claim. The superior court granted summary judgment under

the doctrines of primary agency jurisdiction and res judicata, concluding that the Commission had considered and ruled on the issue whether Chugach conformed with prudent utility practice under the agreement. MEA appeals, arguing that the primary agency jurisdiction doctrine and res judicata were erroneously applied because the Commission did not have jurisdiction to hear MEA's breach of contract claim. Chugach cross-appeals, arguing that collateral estoppel should also have been applied to prevent MEA from relitigating the issue whether Chugach's use of the rate lock conformed to the prudent utility practice standard. We affirm the superior court's grant of summary judgment to Chugach on collateral estoppel grounds.

## II. FACTS AND PROCEEDINGS

MEA and Chugach are electric utility corporations. In 1989 they entered into a modified agreement for the sale and purchase of electric power and energy (the Agreement). Section 17 of the Agreement provides: "Each party to this Agreement covenants and agrees to act in good faith under this Agreement and the terms cited herein, including the obligation ... to act and perform in a manner consistent with Prudent Utility Practice."

The facts giving rise to MEA's breach of contract claim are summarized as follows: In order to raise capital, Chugach issued two sets of bonds in 1991. As of December 31, 1998 Chugach had $23,205,000 in outstanding bonds due in 2002 and $217,705,000 in outstanding bonds due in 2022. These bonds had a blended interest rate of 9.04%, which Chugach noted was "higher than the interest rates that would accrue on debt of the same maturity originated in today's market." Rather than defease or otherwise refinance this debt, Chugach hedged against future rises in interest rates by entering into a treasury rate lock agreement. According to MEA, Chugach's failure to refinance required MEA to pay higher prices on the electricity it bought from Chugach.[1]

---

1. *Matanuska Elec. Ass'n, Inc. v. Chugach Elec. Ass'n, Inc.*, 99 P.3d 553, 557 (Alaska 2004) (inter-

nal footnotes omitted) (*MEA 2004*).

MEA filed a complaint against Chugach alleging breach of contract, stating:

> By failing to timely address the adverse financial consequences associated with the Series A Bonds, at a time when the Bonds are priced significantly above current market rates, [Chugach] has breached the covenant of good faith as well as the covenant to conform to Prudent Utility Practice set forth in Section 17 of the [Agreement].

This is the second time MEA's breach of contract claim has come before us. In *Matanuska Electric Ass'n, Inc. v. Chugach Electric Ass'n, Inc. (MEA 2004 )*,[2] we reversed a determination by the superior court that the Agreement's prudent utility practice provisions did not apply to Chugach's debt management practices, and remanded to the superior court for consideration of whether Chugach breached the prudent utility practice provisions of the contract by entering into the rate lock transaction.

In *MEA 2004*, we also considered whether MEA's breach of contract claim should be stayed or dismissed under the doctrine of primary agency jurisdiction.[3] On the facts before us in *MEA 2004*, the Commission had not yet considered whether Chugach's actions with respect to the rate lock were reasonable.[4] We concluded:

> [T]the questions of whether Chugach failed to abide by prudent utility practices in its debt management practices, and the amount of damages caused by this failure, were initially presented to the Commission. The Commission declined to resolve these questions. Accordingly, although the doctrine of primary agency jurisdiction would normally apply to a case such as this one, we find that the Commission has waived its primary jurisdiction.[5]

We also concluded that the doctrines of res judicata and collateral estoppel were not applicable because the Commission did not adjudicate the merits of MEA's claim.[6]

While *MEA 2004* was on appeal, the Commission exercised its jurisdiction to assess the impact of the rate lock on rates charged by Chugach, and reached a decision that Chugach's actions with respect to the rate lock were reasonable. The Commission's decision, issued on January 31, 2003 (Order 26), is set forth in relevant part below:

> The parties agreed that a utility could manage its debt with either a bond defeasance or a rate lock agreement. A bond defeasance is the purchase of a portfolio of creditworthy government bonds in a manner that allows the cash flow from those bonds to fund the debt service requirements of existing higher interest bonds. The treasury rate lock is a financing tool that Chugach used in conjunction with a "redemption strategy" to protect itself against the cost of interest rates increasing between early 1999, when they were at historic lows, and March 2002, when it could first refinance its high interest long-term debt. The rate lock agreement is a simple contract under which Chugach traded the possible benefits it might capture from lower interest rates in 2002 in exchange for protection against the possible expense that it would incur if interest rates rose instead. The hedge against the potential rise in interest rates Chugach selected was a treasury rate lock contract with Lehman Brothers Financial Products.

> In determining the proper treatment of the expense associated with the rate lock, we look at Chugach's situation at the time of refinancing. In 1991, Chugach refinanced its long-term debt at 9.14 percent and was actively looking for opportunities to refinance and lower its cost of long-term debt and provide less restrictive debt covenants. From 1995 to 2002, Chugach repurchased over $113 million of its original $262 million long-term bonds. During this time, in compliance with Docket U–87–35, Chugach was increasing its equity ratio, raising it from 20 percent in 1992 to 29.2 percent in 2000.

**2.** *Id.*

**3.** *Id.* at 559–60.

**4.** *Id.* at 558–59.

**5.** *Id.* at 560.

**6.** *Id.* at 561.

During 1998 and 1999, interest rates were lower than they had been for many years. In order to take advantage of these rates, Chugach explored options to ensure that it would be able to take advantage of the lower interest rates when the 1991 bonds were callable in 2002. During this same time, relations between Chugach and its Wholesale Customers were very contentious. MEA proposed that Chugach enter into a classic defeasance of its long-term debt. MEA then went so far as to initiate an acquisition of Chugach for Chugach's failure to defease debt. MEA also requested that we conduct a management audit into why Chugach did not defease its debt. As a result of this uncertainty, Standard and Poor's placed Chugach on credit watch, potentially leaving Chugach in a less favorable environment for hedging what were, at that time, very low interest rates. Working with financial advisors, Chugach chose to enter into the rate lock. We now have a divergence of expert witness opinions advocating for and against the rate lock. MEA argued that Chugach was imprudent for entering into the rate lock and that it should have used the defeasance mechanism. Chugach stated that it studied and compared the rate lock against other available alternatives, including defeasance and was not taking action until 2002. Chugach's decision to hedge against rising interest rates was supported by the assessment done by Seagraves and Hein and utilizing the rate lock provided the most advantageous hedging mechanism. Chugach opined that it was a prudent decision to hedge and that the rate lock was reasonable. In retrospect, taking no action may have been a viable option. However, hedging against interest rate movement up or down must be viewed from the perspective of the time the transaction was entered into rather than from critical hindsight.

AEG & T/HEA and HEA and MEA criticized the strategy and methods that Chugach employed in this endeavor. MEA believes that Chugach has imprudently managed its debt and that entering into rate lock transactions was unnecessary. MEA opined that Chugach acted impru-

dently in 1991 when it refinanced its RUS debt and placed nearly all of its total indebtedness in two large fixed-rate bond offerings. MEA criticized Chugach for again failing to diversify its debt when the 1991 bonds became callable in March 2002 and were refinanced. MEA alleged that if Chugach had properly diversified its debt in 1991, or subsequently when the opportunity presented itself, a rate lock would not have been necessary.

The reasonableness of the rate lock is contingent on whether Chugach should have been concerned that the low interest rates available in 1998 and 1999 were going to remain at those levels or would rise and Chugach would lose a significant advantage for refinancing the 1991 bonds. We find it was reasonable for Chugach to be concerned about the stability of the low interest rates available in 1999. Chugach was aware of forecasts that interest rates would rise by the 2002 window for refinancing the 1991 bonds. The risk of rising interest rates warranted a conservative approach and the use of a hedging mechanism that would protect its ability to refinance. Chugach did not reach this conclusion in isolation. Goldman Sachs worked with them to find an approach that took advantage of the low interest rates and determined the best time to act. Subsequently, Chugach retained Seagraves & Hein as advisors who assisted them in selecting from various options. We are also reassured that the Chugach Board of Directors was actively involved in this decision, including having an independent consultant advise them.

We are persuaded by Chugach's assertion that there are few perfect hedges against rising or falling interest rates. The purpose of a hedge is to reduce risk, which was Chugach's stated intent. The rate lock executed by Chugach accomplished the hedge by requiring a payment from Lehman Brothers if borrowing rates rose between the executions of the rate lock in March 1999 and February 2002 when Chugach could refinance their 1991 bonds. If interest rates declined after March 1999, the amount of money Chugach would need

to borrow in 2002 to refinance would be increased to include the amount of the settlement payment with the higher principal payments resulting from the increase in total principal offset by the lower interest payments.

We reject the additional argument that the costs associated with the rate lock should be disallowed because the refinancing occurred outside the test period. Synchronization issues are addressed in a later portion of this order.

We allow Chugach to recover rate lock expenses by amortizing these expenses, $5,713,060 over the life of the refinanced bonds.

The Commission also stated:

MEA requested that we initiate a management audit to investigate Chugach's financial management.... We reject MEA's proposal. We find no evidence that Chugach is mismanaged and warrants further investigation. Chugach has operated without significant base rate modification for approximately 15 years. During that same period, Chugach's bond rating was upgraded.

On remand from *MEA 2004*, Chugach moved for summary judgment based on the Commission's 2003 decision. On August 22, 2005, Superior Court Judge Peter A. Michalski granted summary judgment in favor of Chugach based on the doctrines of primary agency jurisdiction and res judicata. The superior court reasoned that since the Commission had exercised its primary jurisdiction and determined that the rate was reasonable, the Commission's findings would preclude a contrary determination that Chugach's use of the rate lock violated prudent utility practice. The superior court also "recognize[d] that the Commission's rate decision of January 31, 2005 adjudicated the merits of MEA's complaint regarding the debt lock and Chugach's debt management practice."

MEA appeals. Chugach cross-appeals, arguing that the Commission's decision also prevents MEA from litigating its mismanagement claim under the doctrine of collateral estoppel.

## III. DISCUSSION

### A. Standard of Review

We review questions concerning the application of the doctrine of primary agency jurisdiction de novo, as they present questions of law.[7] Whether res judicata or collateral estoppel apply are questions of law, and are therefore reviewed de novo.[8] "We also review a superior court's grant of summary judgment de novo, drawing all reasonable factual inferences in favor of the non-movant, and affirming where the record presents no genuine dispute of material fact and the movant is entitled to judgment as a matter of law."[9]

### B. MEA's Financial Mismanagement Breach of Contract Claim Was Not Barred by Res Judicata.

Under the doctrine of res judicata, "a final judgment in a prior action bars a subsequent action if the prior judgment was (1) a final judgment on the merits, (2) from a court of competent jurisdiction, (3) in a dispute between the same parties (or their privies) about the same cause of action."[10] The superior court granted summary judgment to Chugach in part based on the doctrine of res judicata when concluding that the Commission's 2005 rate decision addressed the merits of MEA's complaints about the debt lock and Chugach's debt management. MEA appeals the superior court's ruling, arguing that "the Commission could neither hear MEA's breach of contract claim nor award MEA the compensatory damages it seeks." Therefore, MEA maintains the Commission was not a court of competent jurisdiction to hear the contract claim and the application of res judicata was erroneous.

According to the Restatement (Second) of Judgments, res judicata does not

---

**7.** *Id.* at 558.

**8.** *Id.*

**9.** *Id.* (citations omitted).

**10.** *Id.* at 561 n. 29 (quoting *Plumber v. Univ. of Alaska Anchorage,* 936 P.2d 163, 166 (Alaska 1997)).

apply to extinguish the claim when the plaintiff is unable to annex all of its claims of relief or seek all desired remedies before the first tribunal.[11] Section 26(1)(c) of the Restatement excepts from the application of res judicata cases where

[t]he plaintiff was unable to rely on a certain theory of the case or to seek a certain remedy or form of relief in the first action because of the limitations on the subject matter jurisdiction of the courts or restrictions on their authority to entertain multiple theories or demands for multiple remedies or forms of relief in a single action, and the plaintiff desires in the second action to rely on that theory or to seek that remedy or form of relief.[12]

With respect to agency determinations, the Restatement (Second) of Judgments, section 83(1) provides that "a valid and final adjudicative determination by an administrative tribunal has the same effects under the rules of res judicata, subject to the same exceptions and qualifications, as a judgment of a court." In particular, the Restatement notes that

[a]n adjudicative determination of a claim by an administrative tribunal does not preclude relitigation in another tribunal of the same or a related claim based on the same transaction if the scheme of remedies permits assertion of the second claim notwithstanding the adjudication of the first claim.[13]

The comments to section 83 further explain that administrative tribunals often have limited jurisdiction and thus claim preclusion should not apply if a plaintiff could not raise a specific claim or seek certain remedies before the administrative tribunal:

[T]he jurisdiction of administrative agencies is usually defined in terms of specified substantive legal provisions, for example, workers' compensation, tax obligations, regulation of a specified business, discrimination in employment, etc. Since the tribunal's authority is delimited in substantive legal terms, the tribunal ordinarily lacks authority to adjudicate claims arising out of the transaction in question but based upon other substantive legal premises. Thus, a workers' compensation commission usually lacks authority to consider claims for punitive damages for injuries intentionally inflicted on an employee in the course of employment; an employment discrimination agency may lack authority to consider claims based on breach of contract. These limitations on authority of the tribunal should carry corresponding limitations on the scope of "claim" for purposes of the rule of claim preclusion.[14]

The comments to section 83 also note that the exception stated in section 26(1)(c) is particularly important in considering claim preclusion with respect to an administrative agency determination.[15]

As MEA argues, the jurisdiction of the Commission is limited, for while the Commission has the power to "investigate, upon complaint or upon its own motion, the rates, classifications, rules, regulations, practices, services, and facilities of a public utility and hold hearings on them[,]"[16] its ability to pro-

---

11. RESTATEMENT (SECOND) OF JUDGMENTS § 26(1)(c) (1982).

12. *Id.*

13. *Id.* at § 83(3).

14. *Id.* at § 83 cmt. g.

15. *Id.*

16. AS 42.05.141(a)(2). The statute provides:

(a) The Regulatory Commission of Alaska may do all things necessary or proper to carry out the purposes and exercise the powers expressly granted or reasonably implied in this chapter, including:

(1) regulate every public utility engaged or proposing to engage in a utility business inside the state, except to the extent exempted by AS 42.05.711;

(2) investigate, upon complaint or upon its own motion, the rates, classifications, rules, regulations, practices, services, and facilities of a public utility and hold hearings on them;

(3) make or require just, fair, and reasonable rates, classifications, regulations, practices, services, and facilities for a public utility;

(4) prescribe the system of accounts and regulate the service and safety of operations of a public utility;

(5) require a public utility to file reports and other information and data.

vide remedies is limited to setting rates.[17] Moreover, the Commission acknowledged the limitations of its jurisdiction, based on the provisions of the Agreement, when it remarked in Order 26:

> The contractual commitment ... has a clear dispute resolution mechanism. Specifically, Section 27(c) provides that a party is entitled to "seek immediate judicial enforcement of this Agreement in the Superior Court for the State of Alaska." Thus, MEA presented its argument in an inappropriate forum; MEA must seek redress in Superior Court. After approval of wholesale power contracts, our jurisdiction becomes limited to issues relating to rates.

Chugach argues that our decision in *Matanuska Electric Ass'n, Inc. v. Chugach Electric Ass'n, Inc., (MEA 2002* ),[18] was a pronouncement that the Commission has jurisdiction to interpret the Agreement in all respects. But our holding in *MEA 2002* was limited to resolution of disputes under section 9(d) of the Agreement, which governs the process Chugach is to follow before implementing a rate change.[19] This case, by contrast, involves a challenge arising under section 17, which addresses good faith and prudent utility practice. We concluded in *MEA 2002*:

> Because § 9(d) of the [purchase and sale agreement] expressly deals with issues lying within the commission's core area of jurisdiction—changes in rates, charges or other tariff provisions—and because § 9(e)(3) evinces the parties' intent to submit to the commission any rate-related disputes arising under the [purchase and sale agreement], we conclude that interpretation of § 9(d) was within the jurisdiction of the commission.[20]

The parties did not submit any rate-related disputes arising under section 17 to the juris-

diction of the Commission, and the issue of good faith does not appear to fall within the Commission's core area of jurisdiction—changes in rates. Therefore, *MEA 2002* is not binding as to the question of the Commission's ability to interpret section 17 of the Agreement.

■ Here, MEA sought remedies in the superior court for the alleged breach of contract, including financial mismanagement on the part of Chugach. Because the Commission did not have the jurisdiction to provide all of the remedies in this contract dispute except for those "relating to rates," res judicata did not apply.

## C. Collateral Estoppel Provides an Independent Basis for Affirming the Judgment.

■ We next turn to Chugach's cross-appeal of the superior court's decision that collateral estoppel did not apply to the Commission's decision. On cross-appeal, Chugach argues that "Chugach's 2000 Rate Case—which included extensive discovery, a multi-week hearing with direct and cross-examination and a long written decision by a three-commissioner panel—was more than an adequate substitute for a judicial procedure. Collateral estoppel precludes the relitigation of MEA's Mismanagement Claim." MEA argues that there is no identity of the issues between the Commission's decision that the costs of the rate lock are an allowable cost and a determination whether Chugach violated its contractual duties to MEA under good faith and prudent utility practices and that therefore collateral estoppel does not apply in this case.

■ The doctrine of collateral estoppel is applicable where:

---

**17.** AS 42.05.431(a) clarifies the power of the Commission to set rates:

> When the commission, after an investigation and hearing, finds that a rate demanded, observed, charged, or collected by a public utility for a service subject to the jurisdiction of the commission, or that a classification, rule, regulation, practice, or contract affecting the rate, is unjust, unreasonable, unduly discriminatory or preferential, the commission shall deter-

mine a just and reasonable rate, classification, rule, regulation, practice, or contract to be observed or allowed and shall establish it by order.

**18.** 58 P.3d 491 (Alaska 2002).

**19.** *Id.* at 493–95.

**20.** *Id.* at 494.

(1) the party against whom the preclusion is employed was a party to or in privity with a party to the first action; (2) the issue precluded from relitigation is identical to the issue decided in the first action; (3) the issue was resolved in the first action by a final judgment on the merits; and (4) the determination of the issue was essential to the final judgment.[21]

We have recognized that "[p]rinciples of finality may be applied to the decisions of administrative agencies if, after case-specific review, a court finds that the administrative decision resulted from a procedure that seems an adequate substitute for judicial procedure and that it would be fair to accord preclusive effect to the administrative decision." [22] A comparison of the issues reveals that precisely the same questions that would be considered by the superior court in adjudicating MEA's breach of contract claim were resolved through the Commission's Order 26.

MEA filed a statement of issues with the Commission asking it to consider the following with respect to Chugach's financial management:

- Whether the expenses related to [Chugach's] acquisition of the speculative hedging instruments known as the "rate lock" were prudently and necessarily incurred.
- Whether [Chugach] acted contrary to the prudent utility practices standard by consolidating nearly all of its total indebtedness in two large, fixed-rate bond offerings[.]
- Whether [Chugach] acted contrary to the prudent utility practices standard by failing to diversify its debt consistent with sound financial management principles.
- Whether [Chugach] acted contrary to the prudent utility practices standard by fail-

ing to refinance high cost debt to take advantage of changing interest rates and provide its consumers with the lowest debt costs.
- Whether [Chugach] acted contrary to the prudent utility practices standard when it purchased speculative hedging instruments known as the "rate lock."
- Whether [Chugach] violated the prudent utility practices standard by failing to manage the "rate lock" instruments consistent with sound financial management practices.

MEA thus squarely placed before the Commission the question whether Chugach's actions were consistent with prudent utility practices. Chugach also filed a statement of issues with the Commission on November 5, 2002. Chugach argued that its debt management practices with respect to the rate lock were prudent. And the Commission decided the issue of the prudence of Chugach's actions in its decision. The Commission noted Chugach's use of financial advisors and the Board's use of an independent consultant before entering into the rate lock. The Commission found it was reasonable for Chugach to be concerned about the risk of rising interest rates, and this warranted the use of the hedging mechanism. The Commission's determination that Chugach's actions were reasonable was essential to its decision to allow Chugach to recover rate lock expenses by amortizing them. Because the issues were vigorously contested before the Commission, it is fair to apply the doctrine of collateral estoppel to the question whether Chugach complied with prudent utility practice.[23] Therefore, we conclude that the grant of summary judgment to Chugach was appropriate based on collateral estoppel grounds.[24]

---

21. *MEA 2004*, 99 P.3d at 561 n. 30 (quoting *Universal Motors, Inc. v. Neary*, 984 P.2d 515, 518 n. 11 (Alaska 1999)).

22. *State, Child Support Enforcement Div. v. Bromley*, 987 P.2d 183, 192 (Alaska 1999) (internal citations and quotations omitted).

23. Chugach argued in its summary judgment motion that MEA could have appealed the Commission's 2003 decision but did not. An administrative appeal would have been the correct

method to seek superior court review of the Commission's decision. AS 42.05.551. The record does not reveal why MEA chose not to file an appeal, and MEA has not claimed equitable tolling in its briefing before us.

24. Because we conclude that collateral estoppel applies to this case, it is not necessary to reach the question whether the superior court properly resolved the issue of primary agency jurisdiction.

## IV. CONCLUSION

We AFFIRM the superior court's grant of summary judgment to Chugach on collateral estoppel grounds.