[911 NE2d 847, 883 NYS2d 785]

Lewis J. Bazakos, Respondent, v Philip Lewis, Appellant, et al., Defendants.

Argued and submitted June 3, 2009; decided June 24, 2009

632

## POINTS OF COUNSEL

*Kopff, Nardelli & Dopf LLP,* New York City (*Peter C. Kopff* and *Martin B. Adams* of counsel), for appellant. I. This action is time-barred by the 2½-year time period applicable to medical malpractice actions, as the claims implicate medical skills and medical judgment, and the independent medical examination was substantially similar to the rendition of medical diagnostic services. (*Scott v Uljanov,* 74 NY2d 673; *Miller v Albany Med. Ctr. Hosp.,* 95 AD2d 977; *Smith v Pasquarella,* 201 AD2d 782; *Twitchell v MacKay,* 78 AD2d 125; *Evangelista v Zolan,* 247 AD2d 508; *Savarese v Allstate Ins. Co.,* 287 AD2d 492.) II. The expectation of the parties to an independent medical examination is that a limited physician-patient relationship exists. (*Violandi v City of New York,* 184 AD2d 364; *Smith v Pasquarella,* 201 AD2d 782; *Twitchell v MacKay,* 78 AD2d 125; *Sosnoff v Jackman,* 45 AD3d 568; *Payette v Rockefeller Univ.,* 220 AD2d 69; *People v Sliney,* 137 NY 570; *Cubito v Kreisberg,* 69 AD2d 738, 51 NY2d 900.) III. Public policy supports a finding that the statute of limitations applicable to a medical malpractice action applies to a claim of injuries sustained during the course of an independent medical examination.

*Ralph A. Hummel,* Woodbury, for respondent. Without a physician-patient relationship, there can be no medical malpractice. (*Cubito v Kreisberg,* 69 AD2d 738, 51 NY2d 900; *Savarese v Allstate Ins. Co.,* 287 AD2d 492; *People v Sliney,* 137 NY 570.)

OPINION OF THE COURT

Smith, J.

We hold that a claim against a doctor for his alleged negligence in performing an independent medical examination (IME) is a claim for malpractice, governed by CPLR 214-a's two-year-and-six-month statute of limitations.

I

Lewis Bazakos, plaintiff in this case, was also the plaintiff in a previously-brought action arising out of an automobile accident. In that action, Bazakos was required, pursuant to CPLR 3121, to undergo an examination, commonly called an IME, by a doctor designated by the adverse party. The person Bazakos sued designated Dr. Philip Lewis, and Lewis examined Bazakos on November 27, 2001.

On October 15, 2004, approximately 2 years and 11 months later, Bazakos commenced this action against Lewis. The complaint alleges that Lewis injured Bazakos during the IME when he "took plaintiff's head in his hands and forcefully rotated it while simultaneously pulling."

Lewis moved to dismiss the case as barred by the statute of limitations. Supreme Court granted the motion (2006 NY Slip Op 30401[U]), relying on the Appellate Division, Second Department's decision in *Evangelista v Zolan* (247 AD2d 508 [2d Dept 1998]). On Bazakos's appeal, the Appellate Division, with two Justices dissenting, overruled *Evangelista* and reversed Supreme Court, holding the action to be timely (*Bazakos v Lewis*, 56 AD3d 15 [2d Dept 2008]). The Appellate Division majority concluded that, because the doctor performing an IME and the person undergoing it do not have a physician-patient relationship, the action was not "for medical . . . malpractice" (CPLR 214-a) and was therefore governed by the three-year statute applicable to personal injury actions generally (CPLR 214 [5]). The dissenting Justices, relying on *Evangelista* and *Twitchell v MacKay* (78 AD2d 125 [4th Dept 1980]), argued that a "limited" physician-patient relationship exists between the examining doctor at an IME and the person examined, and that the action should therefore be considered one for malpractice (56 AD3d at 24).

The Appellate Division granted Lewis leave to appeal, certifying the question of whether its order was properly made. We answer the question in the negative and reverse.

II

Bazakos's argument, which the Appellate Division accepted, is a simple one: He says that medical malpractice is a breach of a doctor's duty to provide his or her patient with medical care meeting a certain standard; that Lewis was not Bazakos's doctor, and Bazakos was not Lewis's patient; and that therefore the negligence of which Lewis is accused cannot be medical malpractice. He points out that the relationship between the doctor and the person the doctor examines at an IME is essentially adversarial; the person examined is required by law to submit to a procedure performed for the benefit of a party seeking to defeat that person's legal claim. The Appellate Division majority quoted the observation in *Payette v Rockefeller Univ.* (220 AD2d 69, 72 [1st Dept 1996]) that "the existence of a physician-patient relationship" is "essential to a cause of action in malpractice" (56 AD3d at 19).

There is some logic to Bazakos's position, but the result he seeks would be an arbitrary one. Bazakos, like any medical malpractice plaintiff, claims he was injured because a doctor failed to perform competently a procedure requiring the doctor's specialized skill; Lewis, like any medical malpractice defendant, is called upon to defend his performance of professional duties. This case is not like *Payette*, in which a volunteer participant in a diet study at Rockefeller University complained of the University's "alleged negligent creation and implementation of its diet research program" (220 AD2d at 72). The act on which Bazakos's lawsuit is based—Lewis's manipulation of a body part of a person who came to his office for a physical examination—constitutes "medical treatment by a licensed physician," and the negligent performance of that act is not ordinary negligence, but a prototypical act of medical malpractice (*Weiner v Lenox Hill Hosp.*, 88 NY2d 784, 788 [1996], quoting *Bleiler v Bodnar*, 65 NY2d 65, 72 [1985]). We see no good reason why the statute of limitations should be longer than it would be if Lewis were accused of making exactly the same error on a patient who came to him for consultation or care.

CPLR 214-a, creating a statute of limitations for certain forms of professional malpractice that is six months shorter than the ordinary personal injury statute, was part of a package of legislation passed in 1975 in response "to a crisis in the medical profession posed by the withdrawal and threatened withdrawal of insurance companies from the malpractice insurance market" (*Bleiler*, 65 NY2d at 68). The purpose of the legislative package

was to enable "health care providers to get malpractice insurance at reasonable rates" (*id.*, quoting Mem of State Exec Dept, 1975 McKinney's Session Laws of NY, at 1601-1602). It is unlikely, in our judgment, that the Legislature would have found less reason to make insurance available to doctors performing IMEs than to those practicing medicine in more traditional contexts, or that it intended any distinction between the two.

We agree with the dissenting Justices at the Appellate Division that the relationship between a doctor performing an IME and the person he is examining may fairly be called a "limited physician-patient relationship"—indeed, this language is used in an American Medical Association opinion describing the ethical responsibilities of a doctor performing an IME (AMA Council on Ethical and Judicial Affairs, Code of Medical Ethics, Ops on Patient-Physician Privilege E-10.03). As the Michigan Supreme Court has explained, this relationship:

> "is not the traditional one. It is a limited relationship. It does not involve the full panoply of the physician's typical responsibilities to diagnose and treat the examinee for medical conditions. The IME physician, acting at the behest of a third party, is not liable to the examinee for damages resulting from the conclusions the physician reaches or reports. The limited relationship that we recognize imposes a duty on the IME physician to perform the examination in a manner not to cause physical harm to the examinee." (*Dyer v Trachtman*, 470 Mich 45, 49-50, 679 NW2d 311, 314-315 [2004].)

Bazakos's claim here is that Lewis breached his duty "to perform the examination in a manner not to cause physical harm to the examinee." That is a claim for medical malpractice, and it is governed by the two-year-and-six-month statute of limitations. Therefore, Bazakos's lawsuit was not timely.

Accordingly, the order of the Appellate Division should be reversed, with costs, the order of Supreme Court reinstated and the certified question answered in the negative.

Chief Judge LIPPMAN (dissenting). During a physical exam compelled by the court upon the application of plaintiff's adversary in separate personal injury litigation (*see* CPLR 3102 [a]; 22 NYCRR 202.17), defendant Dr. Lewis, the examiner designated by plaintiff's adversary to perform the exam, is alleged to have "[taken] plaintiff's head in his hands and forcefully rotated

it while simultaneously pulling." Some 2 years and 11 months later, plaintiff commenced this action alleging that Lewis's manipulation of his head caused him injury. The complaint purports to sound in ordinary negligence. Defendant, however, contends that what is alleged is not simple negligence but medical malpractice. The distinction relied on by defendant, although not marked by a "rigid analytical line"—medical malpractice being but a form of negligence (*Scott v Uljanov*, 74 NY2d 673, 674 [1989]; *see Weiner v Lenox Hill Hosp.*, 88 NY2d 784, 787-788 [1996])—is here of pivotal import since plaintiff's claim would be timely as one for simple negligence (*see* CPLR 214), but would be barred under the shorter limitations period applicable to claims for medical malpractice (*see* CPLR 214-a).

Contrary to the impression that might be produced by the majority writing, the issue of whether allegedly tortious conduct is for statute of limitations purposes to be deemed medical malpractice or ordinary negligence is not new to this Court. Nor is it one whose disposition is ungoverned by settled principles. We have held clearly and repeatedly that "[c]onduct may be deemed malpractice, rather than negligence, when it 'constitutes *medical treatment* or bears a substantial relationship to the rendition of *medical treatment* by a licensed physician' " (*Scott*, 74 NY2d at 674-675, quoting *Bleiler v Bodnar*, 65 NY2d 65, 72 [1985] [emphasis added]; *accord Weiner*, 88 NY2d at 787-788). Here, although Lewis may have employed medical techniques in examining plaintiff, it is plain that no medical treatment was intended or in fact provided. The exam was conducted simply as a disclosure device in litigation and, indeed, one whose benefit inured not to the examinee but to the examinee's adversary. Bereft of any medical treatment rationale or application, Lewis's conduct during his examination of plaintiff is not amenable to description as medical malpractice within the meaning of CPLR 214-a.

This conclusion, of course, is entirely consistent with the purpose of CPLR 214-a's abbreviated limitations period, which was not to afford those providing litigation support services a measure of protection against liability, but to address the threat to the health and welfare of New Yorkers posed by the "inability of *health care providers* to get malpractice insurance at reasonable rates" and to help assure that "the adequate delivery of *health care services*" would not be impaired (Mem of State Exec Dept in Support of L 1975, ch 109, 1975 McKinney's Session Laws of NY, at 1601-1602 [emphasis added]).

While the majority supposes it unlikely that the Legislature "would have found less reason" (majority op at 635) to extend similar protection to doctors not engaged in the provision of medical treatment, the basis for the supposition is far from evident. Indeed, there would appear to be ample reason to treat the two groups of practitioners quite differently. The risks facing a medical clinician diagnosing and treating a patient are of an entirely different order of magnitude than those ordinarily encountered by a medical examiner in a nontreatment context. The situation at bar is illustrative of this disparity. It is conceded that Dr. Lewis's duty towards his examinee was no more extensive than that of refraining from harming him during the exam; he had no medical duty competently to diagnose, inform or, indeed, to treat the subject of his exam. Such an extraordinarily limited scope of professional responsibility stands in sharp contrast to the enormous risks and obligations routinely encountered by physicians providing actual patient care and treatment. While a shortened limitations period may, at the time of CPLR 214-a's enactment, reasonably have been thought necessary to the continued insurability of the latter group of medical practitioners on economically feasible terms, there exists no plausible argument that parity of protection was ever thought necessary to the insurability of practitioners not engaged in the provision of medical treatment.

The majority's embrace of the novel and highly problematic notion that there may be medical malpractice in the absence of medical treatment evidently proceeds from the conviction that the same conduct by a doctor should not be deemed malpractice in one context and negligence in another. Yet, in postulating that a medical examiner, such as defendant, undertakes a limited duty to the examinee not involving " 'the full panoply of the physician's typical responsibilities to diagnose and treat' " (majority op at 635, quoting *Dyer v Trachtman*, 470 Mich 45, 50, 679 NW2d 311, 314 [2004]), the majority must accept what it purports to reject, namely, that what will be malpractice in the context of ongoing medical treatment may not, no matter how glaring the breach, be malpractice in the context of an exam understood by the parties thereto to have no medical treatment objective. Indeed, most of what would be malpractice in the former context is not even actionable in the latter.

Context cannot be consigned to irrelevance, even in the case of what would be "prototypical malpractice." We have held as much. In *Weiner*, where the defendant hospital, intent on hav-

ing its negligence deemed malpractice so as to avail itself of the medical malpractice limitations period, urged that the failure of its physician properly to supervise blood collection could not be viewed except as a breach of his obligations as a physician, we replied,

> "although the Hospital correctly points out that a physician must supervise the process of blood collection (*see, e.g.*, 10 NYCRR 58-2.1 [s]; 58-2.2 [a]), this requirement does not resolve the question of whether the challenged conduct 'bears a substantial relationship to the rendition of medical treatment' to a particular patient, which remains the determinative question on appeal" (*Weiner*, 88 NY2d at 788, quoting *Bleiler v Bodnar*, 65 NY2d at 72).

Here, of course, there was actual contact between plaintiff and physician, but that factual distinction between this case and *Weiner* is one that should possess no dispositive significance. Propinquity, particularly in what is essentially an adversarial situation between an examiner and his or her subject, is not to be confounded with medical treatment. Here, as in *Weiner*, there was no treatment, and that should be "determinative."

While I agree that Lewis in undertaking to examine plaintiff assumed a duty not to harm him in the process, the breach of such a duty would not sound in medical malpractice. The very limited duty arising in this situation bears not the slightest resemblance to the very much more comprehensive set of responsibilities devolving upon a practitioner engaged in treatment—the defining set of responsibilities contemplated by the Hippocratic injunction to do no harm. The duty here implicated does not arise from what is reasonably susceptible of characterization as a doctor-patient relationship, i.e. a treatment relationship; it is simply an instance of the general obligation, frequently enforceable in tort, to refrain from causing foreseeable harm. That is ordinary negligence. It is today denominated "medical malpractice" only by dint of an exercise in judicial artifice untethered to any law or to the actual nature of the transaction known euphemistically as an "independent" medical examination. These exams, far from being independent in any ordinary sense of the word, are paid for and frequently controlled in their scope and conduct by legal adversaries of the examinee. They are emphatically not occasions for treatment, but are most often utilized to contest the examinee's claimed injury and to dispute the need for any treatment at all. Indeed,

according to the Guidelines of Conduct of the American Board of Independent Medical Examiners, the examiner at the exam should "advise the examinee that no treating physician-patient relationship will be established" (http://abime.org/node/21, accessed June 19, 2009). The majority's bare assertion that medical treatment is compatible with this context is merely a form of words. Describing the sliver of a duty that an examiner has during an exam not to harm the examinee as arising from a "limited physician-patient relationship" will be recognized, given the reality it purports to describe, as no more than a device to avail a litigant of a statutory bar.

The cause of action the majority now recognizes for medical malpractice is not only stillborn in this action, but, I will venture, will never possess viability as an actual claim for relief. I am confident that the majority has not the slightest intention to open the vistas of malpractice so wide as to actually permit such claims in the absence of anything cognizable as treatment. What is involved then is simply the arbitrary creation of an exception for a group of practitioners who, as a group, neither seek nor are entitled to the protection properly afforded and reserved to those engaged in the delivery of medical care and treatment.

The well considered decision of the Appellate Division should be affirmed.

Judges CIPARICK, GRAFFEO and READ concur with Judge SMITH; Chief Judge LIPPMAN dissents and votes to affirm in a separate opinion in which Judges PIGOTT and JONES concur.

Order reversed, etc.