**Terry L. SMITH, Appellant,**

v.

**Patrick L. RADECKI, M.D., Appellee.**

**No. S–13171.**

Supreme Court of Alaska.

Aug. 27, 2010.

Terry L. Smith, pro se, Fairbanks, Appellant.

Howard A. Lazar and Kendra E. Bowman, Delaney Wiles, Inc., Anchorage, for Appellee.

Before: CARPENETI, Chief Justice, FABE, WINFREE, CHRISTEN, and STOWERS, Justices.

*OPINION*

CHRISTEN, Justice.

## I. INTRODUCTION

Terry Smith injured his back while working for CSK Auto, Inc. (CSK) and brought a workers' compensation claim. CSK arranged for Dr. Patrick Radecki to perform an independent medical examination to assess Smith's condition. Dr. Radecki examined Smith and reported that he had no physical injury resulting from the incident. But Smith later underwent an MRI which revealed several spinal problems, including a Tarlov cyst. Smith filed suit against Dr. Radecki. His complaint included claims arising from Dr. Radecki's alleged failure to discover the existence of the cyst and Smith's earlier "failed" back surgery. In the alternative, Smith alleged that Dr. Radecki *did* discover his true back condition but failed to report it. The superior court granted Dr. Radecki's motion for summary judgment, ruling that Dr. Radecki and Smith did not have the requisite physician-patient relationship upon which to base a medical malpractice claim, and that Smith's claims were barred by the statute of limitations. Because we conclude that all of Smith's claims were dependent upon him having a physician-patient relationship with Dr. Radecki, and Smith did not have a physician-patient relationship with Dr. Radecki, we affirm the superior court's ruling. We do not reach the statute of limitations issue.

## II. FACTS AND PROCEEDINGS

On March 29, 2001, Terry Smith injured his back while working as a delivery driver for CSK. Unloading cases of antifreeze from the bed of his truck, Smith "lifted and twisted" to remove two cases that were strapped together and immediately experienced "pain in his back and leg that took his breath away." Smith sought medical attention the next day and was treated for "acute muscle strain." He received temporary total disability benefits from March 30, 2001, through April 13, 2001.

When Smith's pain did not improve, additional assessments were performed which revealed abnormalities at L5 and possible degenerative disc disease at L4–5. He underwent a variety of treatments including medication, physical therapy, participation in a work hardening program, and epidural steroid injection.[1] Smith was given some

---

1. The epidural space is located outside the *dura mater* surrounding the spinal cord. 9 Attorneys' Textbook of Medicine § 58.20 (Roscoe N. Gray & Louise J. Gordy eds., 1999). The goal of the epidural steroid injection procedure is to reduce nerve root inflammation. 2 Richard M. Patter-son, Lawyers' Medical Cyclopedia § 16.9[E][2] (6th ed.2009). Smith may have also undergone radiofrequency ablation, a procedure in which heat is created by ionic vibration at the tip of a needle and applied to painful neural tissue. 4 *id.* § 29.15a.

authorized time loss from work and then deemed partially disabled effective May 14, 2001. He returned to work in "a light duty capacity" from May 14 through July 8, 2001, but he continued to report symptoms including weakness, dizziness, disorientation, loss of consciousness, and pain. Smith began to miss work again and received additional temporary total disability benefits. But on August 14, 2001, Dr. Susan Klimow found Smith "medically stable."[2] Later that month Smith's treating doctors began to consider the possibility of psychological factors in his continuing complaints of pain, but physical interventions for his symptoms continued into 2003.[3]

CSK arranged for Dr. Patrick Radecki to perform an independent medical examination (IME) of Smith on July 25, 2003. Dr. Radecki's report states that prior to conducting the examination he informed Smith (1) "that the purpose of the examination was to address specific injuries or conditions, as outlined by [CSK's insurance carrier]," (2) that the IME was "not a substitute for his/her personal physician(s) or health care," and (3) that "[n]o physician/patient relationship exists or is sought." Smith did not dispute that he received this statement describing the scope of Dr. Radecki's engagement.

The report Dr. Radecki prepared reflects his conclusion that Smith suffered from "[m]ild degenerative disc disease" in his "lumbar spine, including minimal disc bulge which [was] not ... symptomatic," and exhibited "nonphysiologic pain behavior and multiple nonphysiologic responses to physical maneuvers ... that should not cause pain, typical of psychogenic pain disorder, severe in nature." In his report Dr. Radecki stated that "there is no objective evidence of permanent partial impairment that can be said to have been caused by the March 29, 2001, incident," advised against further physical or pharmacological interventions, and suggested psychological treatment and weight loss.

Smith again reported severe pain symptoms during subsequent vocational rehabilitation and underwent an MRI at Fairbanks Memorial Hospital on November 8, 2004. The MRI revealed disc desiccation at the L5–S1, L4–L5, and L3–L4 levels, displacement of the left S1 nerve root, L5 limbus vertebra, and a small sacral Tarlov cyst.[4]

On December 17, 2004, Smith filed a workers' compensation claim for ongoing medical bills and temporary total disability during recovery from anticipated back surgery. The claim alleged that the anticipated surgery would address pain arising from Smith's 2001 work-related injury. CSK controverted the claim, relying principally upon Dr. Radecki's conclusions that: (1) Smith was medically stable as of July of 2003; (2) Smith had no permanent impairment resulting from the 2001 injury; and (3) Smith did not require further medical treatment.

Smith filed suit against Dr. Radecki in the superior court in October 2006. His complaint included 18 claims that we group into three categories: (1) claims arising from Dr. Radecki's alleged failure to discover and properly treat his back condition;[5] (2) claims associated with the alternative theory that Dr. Radecki *did* discover the nature of Smith's back condition but did not report these findings to Smith;[6] and (3) claims that

2. Smith was referred to Dr. Klimow for evaluation and treatment of lumbar strain by Dr. John Duddy, an orthopedic surgeon who had treated Smith.

3. Pages are missing from the record of Smith's medical history; it is unclear exactly what treatment he received between August of 2001 and April of 2003.

4. "[A] perineural cyst found in the radicles of the lower spinal chord; it is usually productive of symptoms." STEDMAN'S MEDICAL DICTIONARY 389 (25th ed.1990).

5. Claims in the first category include gross negligence, "failure to diagnose" (argued as two separate counts), "failure to use due care," misdiagnosis, "[f]ailure to provide appropriate treatment for a medical condition; [i]mproper diagnosis," "[l]ack of informed consent," "negligen[t] concealment of injury," battery, and "breach of duty." Smith's abandonment claim also falls into the first category: it alleges that Dr. Radecki "failed to attend and care for" Smith and that he failed to notify Smith of his withdrawal from the physician-patient relationship.

6. The claims in the second category include "[f]ailure to advise of diagnosis," fraud, "[f]alse [r]epresentation," and spoliation of evidence. These claims are premised on the theory that Dr. Radecki discovered, but failed to report, the Tar-

are actually prayers for relief when read in context.[7]

Dr. Radecki moved for summary judgment on the grounds that Smith's claims were: (1) barred by the statute of limitations; and (2) precluded by the lack of a physician-patient relationship and corresponding duty of care. Dr. Radecki asked the superior court to "construe each of plaintiff's allegations as sounding in medical malpractice" and argued that "for plaintiff to succeed on any of [his] claims, there must have been a physician/patient relationship." Smith's opposition to the motion did not respond to the contention that Smith's claims should be treated as a malpractice allegation, but it did reiterate Smith's entire list of claims.

The superior court granted summary judgment, ruling that Dr. Radecki did not owe Smith a duty of care and that the statute of limitations barred his claims. The court's order did not distinguish between Smith's claims, impliedly treating them all as variously-stated claims for medical malpractice. Smith moved for reconsideration of the order granting summary judgment, but the superior court denied his motion and entered final judgment in favor of Dr. Radecki. Smith appeals.

## III. STANDARD OF REVIEW

■ We review a grant of summary judgment "de novo, affirming if the record presents no genuine issue of material fact and if the movant is entitled to judgment as a matter of law. All reasonable inferences are drawn in favor of the nonmovant in this examination."[8]

■ We review questions of law using the de novo standard, "apply[ing] our indepen-

dent judgment to questions of law, adopting 'the rule of law most persuasive in *light of* precedent, reason, and policy.'"[9]

## IV. DISCUSSION

■ Dr. Radecki argues that he did not owe a duty of care to Smith because he did not have a physician-patient relationship with Smith. Dr. Radecki examined Smith only once, and only in the context of conducting an IME. His report reflects the fact that Smith was informed of the limited nature of their professional relationship.

Alaska Statute 09.55.540 defines the standard of care for malpractice actions based upon the negligent or willful misconduct of health care practitioners. We have previously held that the duty to meet this standard of care arises specifically from the existence of a physician-patient relationship.[10] We have not previously considered whether the performance of an IME creates a physician-patient relationship between a doctor and an examinee or whether such an examination otherwise gives rise to a duty of care owed to the examinee.

Alaska Statute 09.55.540 requires that a party alleging medical malpractice in Alaska must prove:

(1) the degree of knowledge or skill possessed or the degree of care ordinarily exercised under the circumstances, at the time of the act complained of, by health care providers in the field or specialty in which the defendant is practicing;

(2) that the defendant either lacked this degree of knowledge or skill or failed to exercise this degree of care; and

---

lov cyst and that he discovered, but failed to report, that Smith's earlier surgery had been unsuccessful.

7. These include "[i]nterference [with] medical treatment," "[i]nterference [with] employment contract," and emotional distress. In these claims Smith addresses the ways in which Dr. Radecki's diagnosis disrupted his access to continuous treatment paid for by CSK's workers' compensation insurance.

8. *Beegan v. State, Dep't of Transp. & Pub. Facilities,* 195 P.3d 134, 138 (Alaska 2008) (citing

*Matanuska Elec. Ass'n v. Chugach Elec. Ass'n,* 152 P.3d 460, 465 (Alaska 2007)).

9. *Jacob v. State, Dep't of Health & Soc. Servs.,* 177 P.3d 1181, 1184 (Alaska 2008) (quoting *Guin v. Ha,* 591 P.2d 1281, 1284 n. 6 (Alaska 1979)).

10. *M.A. v. United States,* 951 P.2d 851, 856 (Alaska 1998) (holding that "the source of a physician's duty to provide reasonably competent care lies in the unique nature of the physician-patient relationship").

(3) that as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

In *M.A. v. United States*, we held that the duty to meet the standard of care specified in AS 09.55.540 is dependent upon the existence of a physician-patient relationship.[11] *M.A.* involved a minor's parents who alleged that their child's physician owed an independent duty of care to them. We held that the source of a physician's duty to provide reasonably competent medical care lies in the unique nature of the physician-patient relationship, and that a physician owes no comparable duty of care where no physician-patient relationship exists.[12] Dr. Radecki relied on *M.A.* in his motion for summary judgment to support his argument that he did not owe a duty of care to Smith.

Decisions from the majority of other states support Dr. Radecki's assertion that Smith's medical malpractice claim should fail as a matter of law for lack of a duty of care. These jurisdictions have concluded that an IME performed at the behest of a third party does not give rise to a physician-patient relationship or to potential for medical malpractice liability.[13] Courts adopting this rule rely principally upon the desire not to chill the willingness of doctors to act as expert witnesses in workers' compensation cases.[14] In these states, the duty of care for providing a correct diagnosis runs to the IME physician's employer rather than the patient.[15]

Given these authorities, the starting point for analyzing what duty Dr. Radecki owed to Smith must be the scope of work Dr. Radecki agreed to perform. Dr. Radecki expressly advised Smith at the outset of the IME that no physician-patient relationship would be undertaken and that the purpose of the examination was limited to the specific injuries or conditions identified by CSK's insurance carrier. We recognize that IME physicians examine and interact directly with examinees, but we disagree with Smith's argument that they thereby establish physician-patient relationships with examinees. Physicians conducting IMEs at the behest of third parties assume a fundamentally different role from a diagnosing or treating physician; typically, a physician conducting an IME is not selected by the examinee, is not hired by the examinee, does not report to the examinee, and does not provide treatment to the examinee. We are not persuaded that a physician who performs an IME undertakes a traditional physician-patient relationship or owes an examinee the duty of care that attends such a relationship.

■ Smith argues that even if he and Dr. Radecki did not have a traditional physician-patient relationship, we should rule that they had a limited physician-patient relationship giving rise to a duty to correctly diagnose Smith's condition. Smith supports this argument two ways. First, he argues that Dr. Radecki is a member of the American Medical Association (AMA) and the AMA's ethical guidelines state that a limited physician-patient relationship is established when an IME is performed. Second, he argues that a growing body of case law from other states recognizes a limited duty of care exists when IMEs are performed. We do not find either argument to be persuasive.

Smith argues that Dr. Radecki's membership in the AMA makes him susceptible to Smith's medical malpractice claim because the AMA's professional standards describe a "limited patient-physician relationship" in the context of an IME. The phrase Smith quotes comes from the AMA's ethics guidelines, a

11. *Id.*

12. *Id.*

13. *See, e.g., Hafner v. Beck*, 185 Ariz. 389, 916 P.2d 1105, 1107–08 (App.1995); *Felton v. Schaeffer*, 229 Cal.App.3d 229, 235–36, 279 Cal.Rptr. 713 (Cal.App.1991); *Martinez v. Lewis*, 969 P.2d 213, 219–20 (Colo.1998); *Peace v. Weisman*, 186 Ga.App. 697, 368 S.E.2d 319, 320–21 (1988); *Henkemeyer v. Boxall*, 465 N.W.2d 437, 439 (Minn.App.1991); *Ervin v. Am. Guardian Life Assurance Co.*, 376 Pa.Super. 132, 545 A.2d 354, 358 (1988); *Johnston v. Sibley*, 558 S.W.2d 135, 137 (Tex.Civ.App.1977); *Joseph v. McCann*, 147 P.3d 547, 551–52 (Utah App.2006); *Rand v. Miller*, 185 W.Va. 705, 408 S.E.2d 655 (1991); *Erpelding v. Lisek*, 71 P.3d 754, 760 (Wyo.2003).

14. *See, e.g., Hafner*, 916 P.2d at 1107; *Martinez*, 969 P.2d at 219.

15. *See, e.g., Hafner*, 916 P.2d at 1106; *Felton*, 229 Cal.App.3d at 235, 279 Cal.Rptr. 713.

non-binding code for ethical behavior by member physicians.[16] Smith offers no authority for the implied argument that these guidelines bear on the scope of IME physicians' legal liability in Alaska. Moreover, taken in context, the statement Smith relies upon does not support his claim in this instance. AMA ethics opinion 10.03 outlines the duty of IME physicians to: (1) be objective; (2) maintain examinee confidentiality; (3) disclose conflicts of interest; (4) inform examinees of the limited nature of the relationship arising from the IME; and (5) make patients aware of abnormalities discovered during the exam.[17] Smith did not present any evidence that Dr. Radecki failed to abide by any of these standards. Thus, even if we were to consider ethics opinion 10.03 to create a duty of care, it would not support Smith's claim against Dr. Radecki.

■ As for Smith's second argument, we acknowledge that courts in several other states have held that physicians owe a limited duty of care in an IME setting.[18] For example, the Tennessee Court of Appeals held that a limited physician-patient relationship exists when an IME is conducted, such that the physician has a duty not to injure the patient during the examination.[19] Similar decisions have been reached by courts in New York,[20] Colorado,[21] and Michigan.[22] The Michigan court described the limited duty as:

> ... not the traditional one. It is a limited relationship. It does not involve the full panoply of the physician's typical responsibilities to diagnose and treat the examinee for medical conditions. *The IME physician, acting at the behest of a third party, is not liable to the examinee for damages resulting from the conclusions the physician reaches or reports.* The limited relationship that we recognize imposes a duty on the IME physician to perform the examination in a manner not to cause physical harm to the examinee.[23]

Other courts have held that physicians have limited duties of care encompassing the duty to discover[24] and warn an examinee[25] of conditions which pose an "imminent danger" to the examinee's health, and to provide correct information to a patient about his condition in the event the IME physician "gratuitously undertakes to render services which

**16.** *History of AMA Ethics*, Am. Med. Ass'n, http://www.ama-assn.org/ama/pub/physician-resources/medicalethics/code-medical-ethics/history-ama-ethics.shtml (last visited July 16, 2010).

**17.** *Opinion 10.03–Patient–Physician Relationship in the Context of Work–Related and Independent Medical Examinations*, Am. Med. Ass'n (Dec.1999), http:// www.ama-assn.org/ama/pub/physician-resources/medical-ethics/codemedical-ethics/opinion1003.shtml.

**18.** *See, e.g., Green v. Walker*, 910 F.2d 291, 296 (5th Cir.1990); *Betesh v. U.S.*, 400 F.Supp. 238, 246–47 (D.D.C.1974); *Ritchie v. Krasner*, 221 Ariz. 288, 211 P.3d 1272, 1280–81 (App.2009); *Keene v. Wiggins*, 69 Cal.App.3d 308, 313, 138 Cal.Rptr. 3 (Cal.App.1977); *Webb v. T.D.*, 287 Mont. 68, 951 P.2d 1008, 1013–14 (1997); *Hoover v. Williamson*, 236 Md. 250, 203 A.2d 861, 863–64 (1964); *Reed v. Bojarski*, 166 N.J. 89, 764 A.2d 433, 443–44 (2001); *Johnston*, 558 S.W.2d at 137.

**19.** *Gentry v. Wagner*, No. M2008–02369–COA–R3–CV, 2009 WL 1910959 (Tenn.App. June 30, 2009).

**20.** *Bazakos v. Lewis*, 12 N.Y.3d 631, 883 N.Y.S.2d 785, 911 N.E.2d 847, 850 (2009) (holding that such a limited relationship encompasses a duty not to injure, but no duty to correctly diagnose).

**21.** *Slack v. Farmers Ins. Exch.*, 5 P.3d 280, 283–84 (Colo.2000).

**22.** *Dyer v. Trachtman*, 470 Mich. 45, 679 N.W.2d 311, 314–15 (2004).

**23.** *Id.* (emphasis added).

**24.** *Webb v. T.D.*, 287 Mont. 68, 951 P.2d 1008, 1013–14 (1997) (health care provider retained by third party to perform IME owes duty to patient to: (1) discover conditions posing "imminent danger" to examinee and take reasonable steps to alert examinee; and (2) assure advice to examinee meets standard of care for provider's profession; IME provider does not "have the same duty of care that a physician has to his or her own patient").

**25.** *Id.; see also Green v. Walker*, 910 F.2d 291, 296 (5th Cir.1990) (physician who performs pre-employment medical examination for employer has affirmative duty to act in keeping with training and expertise and must inform patient of conditions posing imminent danger); *Betesh v. United States*, 400 F.Supp. 238, 246–47 (D.D.C. 1974) (army physicians who discovered abnormality in chest X-ray during selective service screening exam had affirmative duty to notify examinee of need for further medical attention); *Reed v. Bojarski*, 166 N.J. 89, 764 A.2d 433, 443–

he should recognize as necessary to another's bodily safety."[26]

 Though we acknowledge this growing body of case law, we also recognize that it is not implicated by the evidence Smith offered. Smith did not present admissible evidence that Dr. Radecki failed to diagnose a condition that posed imminent harm, that Dr. Radecki knew of and concealed an imminently dangerous condition,[27] that Dr. Radecki went beyond his role as an IME physician and gratuitously rendered medical advice directly to Smith,[28] or that Dr. Radecki injured Smith during the course of the examination itself.[29] Dr. Radecki's examination of Smith consisted of a review of Smith's medical records and a brief physical examination that was further limited by Smith himself.[30] Dr. Radecki delivered copies of his report to Smith's employer and legal representative and had no further direct contact with Smith. In sum, even if we were to recognize the limited duty that has been imposed by courts in other states, such a duty would not extend to actions taken by Dr. Radecki in this case.[31]

 The superior court did not err in concluding that Dr. Radecki did not have a

physician-patient relationship with Smith that would allow for liability for medical malpractice. This conclusion is fatal to the first category of Smith's claims, all of which expressly allege medical malpractice. To the extent Smith's second category of claims is premised upon the theory that Dr. Radecki willfully failed to disclose information he discovered during the IME, Smith's claims fail because he offered no admissible evidence to raise a genuine issue of material fact that Dr. Radecki discovered the cyst or that Smith's earlier surgical procedure was unsuccessful. Nor did Smith explain why, in the absence of a physician-patient relationship, Dr. Radecki would have had a duty to report these conditions to Smith if he had discovered them.[32]

## V. CONCLUSION

We AFFIRM the superior court's order granting summary judgment in favor of Dr. Radecki on the issue of duty.

---

44 (2001) (physician retained to perform pre-employment physical has affirmative, non-delegable duty to inform patient of potentially serious medical condition).

26. *Hoover v. Williamson*, 236 Md. 250, 203 A.2d 861, 863 (1964) (plaintiff may not ordinarily recover for malpractice without express doctor/patient relationship, but "one who gratuitously undertakes to render services which he should recognize as necessary to another's bodily safety, and leads the other in reasonable reliance on the services to refrain from taking other protective steps, or to enter on a dangerous course of conduct, 'is subject to liability to the other for bodily harm resulting from the actor's failure to exercise reasonable care to carry out his undertaking' ").

27. *Cf. Webb*, 951 P.2d at 1013–14; *see also Green*, 910 F.2d at 296; *Betesh*, 400 F.Supp. at 246–47; *Reed*, 764 A.2d at 443–44.

28. *Cf. Hoover*, 203 A.2d at 863.

29. *Cf. Gentry v. Wagner*, No. M2008–02369–COA–R3–CV, 2009 WL 1910959, at *7–8 (Tenn.App. June 30, 2009).

30. Smith refused to remove a lumbosacral corset for the examination and "forcefully decline[d] examination of the area, even with the corset left

on," declined to perform range of motion tests, and refused to do a pelvic rotation movement.

31. We agree with Smith that the absence of a physician-patient relationship does not *immunize* a physician performing an IME from all tort liability, and we do not rule out the possibility that a physician could be liable for conduct committed during an IME that is both tortious and not dependent upon a physician-patient relationship. Indeed, at oral argument before the superior court, Dr. Radecki's counsel acknowledged that an IME physician has "a duty to act carefully and reasonably." But the absence of a physician-patient relationship is fatal to Smith's medical malpractice claims.

32. Smith does not argue on appeal that the superior court erred by treating all of his original claims as a single count of medical malpractice without explanation, nor did he argue this point below. It would have been preferable for the superior court to address Smith's claims individually or memorialize its implied conclusion that all of Smith's claims are variously phrased medical malpractice claims. But because our independent review of the record leads us to conclude that Smith's complaint was correctly interpreted as asserting multiple claims of medical malpractice, the superior court's error was harmless in this instance.