[891 NYS2d 584]

CLEMENTINE HARRIS ROWE, Respondent, v KEITH WAHNOW, Appellant and Third-Party Plaintiff. ANTON A. ROWE, Third-Party Defendant.

Supreme Court, Appellate Term, First Department, November 19, 2009

## APPEARANCES OF COUNSEL

*Buratti, Kaplan, McCarthy & McCarthy*, Yonkers, for appellant and third-party defendant. *Belovin & Franzblau, LLP*, Bronx, for respondent.

## OPINION OF THE COURT

Per Curiam.

Order, dated March 12, 2008, reversed, with $10 costs, motion granted and complaint dismissed. The Clerk is directed to enter judgment accordingly.

■ Defendant established prima facie that plaintiff did not sustain a serious injury within the meaning of Insurance Law § 5102 (d). Defendant's examining physicians found that plaintiff had recovered from soft tissue injuries, without neurological or orthopedic disability, and had normal ranges of motion (*see Gorden v Tibulcio*, 50 AD3d 460 [2008]; *Johnson v Paulino*, 49 AD3d 379 [2008]; *Rossi v Alhassan*, 48 AD3d 270 [2008]). Plaintiff's opposition papers, lacking any "objective medical findings based on a recent medical examination" (*Thompson v Abbasi*, 15 AD3d 95, 98 [2005]), were insufficient to raise a triable issue. Aside from several visits to defendant's examining doctors, and alleged testing and physical therapy (reports of which were not submitted), the record lacks any evidence of plaintiff's treatment for injuries allegedly sustained in this motor vehicle accident. Nor does the record disclose the existence of a triable issue as to whether plaintiff sustained a nonpermanent injury that prevented her from performing substantially all material daily activities for at least 90 of the first 180 days following the accident.

■ In reaching this result, we do not intend to minimize the concerns voiced by the dissent over the use of independent medi-

cal examinations conducted in the context of claims for first-party no-fault benefits. However, in our judgment, this is an inappropriate case to authoritatively address those concerns, where both sides have charted their litigation course by affirmatively relying, both below and on appeal, on the same independent medical examination reports whose perceived misuse the dissenter now invokes, without input from the parties, as the sole basis for deciding the appeal. "For us now to decide this appeal on a distinct ground that we winkled out wholly on our own would pose an obvious problem of fair play" (*Misicki v Caradonna*, 12 NY3d 511, 519 [2009]).

McKEON, P.J. (dissenting). At the core of New York's no-fault automobile insurance scheme is the bright line difference between a claimant's entitlement to first-party benefits, i.e., wages and medical care (basic economic loss), irrespective of fault, and the right of a seriously injured person to bring a lawsuit for damages (*see Montgomery v Daniels*, 38 NY2d 41 [1975]). The former is the product of a statutory and regulatory design by which a person involved in an automobile accident is able to receive prompt medical attention and treatment in the immediate aftermath of the accident. While the system is not perfect and instances of fraud have been found, there is Insurance Department oversight over the process and its basic aim—the creation of a simplified and non-adversarial system to provide basic benefits irrespective of fault—has been achieved. In reality, the standard automobile policy in New York, while remaining a liability policy providing defense and indemnity for suits arising from a vehicular accident, has a distinctly severable feature, medical insurance, making it in actuality, two separate policies in one (*see Pommells v Perez*, 4 NY3d 566, 571 [2005]). Given this reality, the Court of Appeals in *Dermatossian v New York City Tr. Auth.* (67 NY2d 219, 226 [1986]), recognized that "strong policy considerations militate against permitting proof [that] a claimant's receipt of first-party benefits for an injury covered by no-fault insurance as bearing on a material point in issue in the ensuing lawsuit to recover damages for those injuries."

The matter at bar presents a troubling scenario in which the findings of two physicians, who conducted physical examinations of plaintiff to determine her continued entitlement to

first-party benefits,* were detrimentally used against plaintiff in the within personal injury action. I write separately because I believe that the use of these reports, under such circumstances, violates public policy and the purpose and spirit of New York's No-Fault Law. I would, therefore, preclude their use and affirm Civil Court's denial of summary judgment, albeit for reasons different than those stated by the motion court.

In support of his motion for summary judgment on the ground of lack of serious injury in this automobile personal injury action, defendant offered, as the only admissible evidence of plaintiff's medical condition, affirmed medical reports by Drs. Edward M. Weiland and Dr. S.W. Bleifer, prepared following their independent medical examinations (IMEs) of plaintiff to determine whether she should continue to receive no-fault benefits.

The acronym IME has several meanings within the jurisprudence of New York. The most common involves the typical personal injury lawsuit, where a party has, by virtue of statute and court rule (*see* CPLR 3102 [a]; 22 NYCRR 202.17), the right to have an alleged injured person examined by a physician of one's choosing for purposes of providing testimony at trial, usually to place at issue the extent and severity of claimed injuries. Within this context, the term independent medical examination, particularly the "independent" prong of the term, has long been winked at by the bench and bar. Few consider the physical examination conducted for purposes of litigation as independent; indeed, one court has described it as part of the "adversarial process" (*Bazakos v Lewis*, 56 AD3d 15, 18 [2008], *revd on other grounds* 12 NY3d 631 [2009]) with Chief Judge Lippman forthrightly observing that "[t]hese exams, far from being independent in any ordinary sense of the word, are paid for and frequently controlled in their scope and conduct by legal adversaries of the examinee" (*id.* at 638 [Lippman, Ch. J., dissenting]).

But other permissible uses of IMEs are not intended, at least facially, to be part of a partisan exercise; rather, their purpose is to elicit medical information to assist a third party in determining the extent of a person's disability or entitlement to medical care or benefits. Thus, a workers' compensation carrier may conduct an IME of a claimed injured claimant (*see* 11 NYCRR

---

* While not denominated as such, the subject reports, because they are dated prior to the filing and service of the complaint, could only have been prepared for purposes of determining plaintiff's continued eligibility for first-party benefits.

65-1.1 [d]; 65-3.5 [d]), a police department may utilize an IME to determine whether an injured officer can be returned to duty (*see Violandi v City of New York*, 184 AD2d 364 [1992]) or, as occurred here, an automobile insurance carrier may utilize an IME to determine whether a claimant is entitled to further care and treatment or other first-party benefits. Notably, the reports of Drs. Weiland and Bleifer were prepared for this purpose, not as part of the discovery process in this litigation. Indeed, there is no indication in the record that defendant ever requested a physical examination of plaintiff in the context of this litigation.

Under regulations promulgated by the Insurance Department (*see* 11 NYCRR 65.15 [a], now 11 NYCRR 65-3.2), a person involved in an automobile accident who makes claim for no-fault benefits is not to be treated "as an adversary" by an insurer, whose primary charge is to make "prompt and fair payment." Presumably, this mandate requires an insurer to act in good faith in assessing a claimant's injuries and the need for continuing medical services. The physician who conducts an IME to assess continued eligibility for first-party benefits is a vital part of that process, and while his or her relationship to the claimant/examinee is not one of physician/patient, it must be marked by the same standards of good faith which are intended to characterize an insurer's responsibility to one entitled to first-party benefits under its policy.

But how is that mandate achieved if an IME report, intended to be the product of a nonadversarial process, is used, as here, for adversarial purposes? In my view, an unacceptable dichotomy results if a physician, conducting an IME meant to determine a claimant's need for further medical care, knows that a report, containing findings adverse to the examinee, may potentially be utilized for a different purpose, in a different forum, and perhaps for an additional fee. Moreover, according to the Guidelines of Conduct of the American Board of Independent Medical Examiners, the examiner at an IME must "provide the examinee with the name of the party requesting the examination" and "be honest in all communications" (http://www.abime.org/node/21, accessed Dec. 10, 2009). Query, was plaintiff advised by either Drs. Bleifer or Weiland that their reports might be admissible (adversely to plaintiff's interest as it turned out) in her subsequent personal injury action? Should such disclosure have been made and did plaintiff have a right to refuse to be examined by physicians whose objectivity, under the circumstances, was arguably subject to question. Did the doctors even know that their reports would be used for another purpose?

There are other causes of concern. Unlike an IME conducted as part of discovery in ongoing litigation, under 11 NYCRR 65-1.1, an insurer may request an IME "as often as, the Company may reasonably require it." Turning to the facts at bar, plaintiff was examined on three occasions, within six months, by Dr. Bleifer, who issued a separate report for each examination. This is understandable if the purpose of frequent medical examinations is to monitor issues related to a claimant's recovery and need for future treatment, but appears fundamentally unfair when one of the generated reports is used to the detriment of the claimant in an unrelated lawsuit. The problem is obvious: by using Dr. Bleifer's report as the supporting medical affidavit in his summary judgment motion, it can be argued that defendant got more than one bite at the apple; he got three. Multiple examinations and reports generated for one purpose appear to have been improperly used for another.

To be clear, my concerns with defendant's use of the reports of Drs. Weiland and Bleifer, under the specific facts of this case, should not be taken as a judicial expression that such reports may not be used in conjunction with other medical reports to resolve the threshold serious injury question within the context of a summary judgment motion (cf. *Pommells v Perez*, 4 NY3d 566, 577 n 5 [2005]; *Navedo v Jaime*, 32 AD3d 788 [2006]). Basic fairness and the fundamental purpose of the No-Fault Law is best achieved by restricting the use of such reports to the purpose for which they were prepared, not as a substitute for a physical examination permitted, as a discovery device, by statute or court rule.

Finally, my colleagues in the majority are correct; the issues discussed in this dissent were never raised below nor otherwise addressed by the parties. Nonetheless, the legal dogma raised here is readily apparent "upon the face of the record" and could not have been avoided if earlier called to the attention of the parties. Thus, "the matter is reviewable" (*Chateau D' If Corp. v City of New York*, 219 AD2d 205, 209 [1996], *lv denied* 88 NY2d 811 [1996]).

HEITLER and SHULMAN, JJ., concur. McKEON, P.J., dissents in a separate opinion.